803 A.2d 53

TOLL BROTHERS, INC., A DELAWARE CORPORATION, PLAINTIFF–RESPONDENT, v. TOWNSHIP OF WEST WINDSOR, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY LOCATED IN MERCER COUNTY, MAYOR AND COUNCIL OF THE TOWNSHIP OF WEST WINDSOR, AND THE PLANNING BOARD OF THE TOWNSHIP OF WEST WINDSOR, DEFENDANTS–APPELLANTS.

Argued November 27, 2001—Decided August 1, 2002.

504

505

506

508

Karen L. Cayci and Michael J. Herbert argued the cause for appellants Township of West Windsor and Mayor and Council of the Township of West Windsor (Herbert, Van Ness, Cayci & Goodell, attorneys).

Gerald J. Muller argued the cause for appellant Planning Board of the Township of West Windsor (Miller, Porter & Muller, attorneys).

*Carl S. Bisgaier* and *Henry A. Hill, Jr.* argued the cause for respondent (*Hill Wallack* and *Flaster Greenberg Wallenstien Roderick Zuckerman Skinner & Kirchner,* attorneys; *Mr. Hill* and *Kenneth E. Meiser,* on the briefs).

*Howard D. Cohen* argued the cause for *amicus curiae* American Planning Association and its New Jersey Chapter (*Stern Greenberg & Kilcullen,* attorneys).

*Edwin W. Schmierer* argued the cause for *amicus curiae* New Jersey State League of Municipalities (*Mason, Griffin & Pierson,* attorneys; *Trishka Waterbury,* on the brief).

*Peter A. Buchsbaum* argued the cause for amici curiae New Jersey Builders Association and National Association of Home Builders (*Greenbaum, Rowe, Smith, Ravin, Davis & Himmel,* attorneys).

*Peter J. O'Connor* argued the cause for *amici curiae* Southern Burlington County NAACP, Camden County NAACP and Fair Share Housing Development (*Mr. O'Connor,* attorney; *Mr. O'Connor* and *Kevin D. Walsh,* on the brief).

*John M. Payne* argued the cause for *amici curiae* Housing and Community Development Network of New Jersey, Coalition for Affordable Housing and the Environment, Association of New Jersey Environmental Commissions, Regional Planning Partnership and New Jersey Future (*Ann Alexander, Acting Director, Rutgers Environmental Law Clinic,* attorney; *Mr. Payne* and *Susan J. Kraham,* on the brief)

The opinion of the Court was delivered by

PORITZ, C.J.

This is a second round *Mount Laurel* exclusionary zoning case brought by Toll Brothers, Inc. (Toll Brothers) against the Township of West Windsor, the Township Committee of the Township of West Windsor, and the Planning Board of the Township of West Windsor (collectively "West Windsor" or the "Township"). Toll Brothers, the owner of a 293 acre tract of land located in West Windsor, alleged below that the Township had engaged in

exclusionary zoning in violation of the New Jersey Constitution and the Fair Housing Act of New Jersey (FHA), *N.J.S.A.* 52:27D–301 to –329, and sought a builder's remedy from the trial court. *Toll Bros., Inc. v. Township of West Windsor,* 303 *N.J.Super.* 518, 526–27, 697 *A.*2d 201 (Law Div.1996) (*West Windsor*). Following a bench trial, the court concluded that West Windsor was "not in compliance with the *Mount Laurel* mandate, and thus . . . [had] violat[ed] . . . the New Jersey Constitution and the New Jersey Fair Housing Act." *Id.* at 574, 697 *A.*2d 201. Based on that finding, the trial court held that Toll Brothers was entitled to a builder's remedy, the specifics of which were to be addressed at a later date. *Id.* at 575–76, 697 *A.*2d 201.

The Appellate Division affirmed, *Toll Bros., Inc. v. Township of West Windsor,* 334 *N.J.Super.* 109, 756 *A.*2d 1074 (App.Div.2000), and we granted certification limited to the issues of whether West Windsor's ordinances, regulations, and site factors prevented a realistic opportunity for development of affordable housing; whether market demand for particular housing types should have been considered in making that determination; and, whether Toll Brothers was entitled to a builder's remedy. *Toll Bros., Inc. v. Township of West Windsor,* 167 *N.J.* 599, 772 *A.*2d 914 (2001) (granting certification in part on limited issues); *Toll Bros., Inc. v. Township of West Windsor,* 167 *N.J.* 600, 772 *A.*2d 914 (2001) (same).

## TABLE OF CONTENTS

 I. *Mount Laurel* and Affordable Housing Litigation . . . . . 511

 II. The Fair Housing Act and the Council on Afforda-
 ble Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 513

III. The Prior and Present Litigation . . . . . . . . . . . . . . . . . . . . . 514

 A. The Prior Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 514
 B. The Present Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . 516
 1. Site–by–Site Evaluation . . . . . . . . . . . . . . . . . . . . . 523
 2. Market Demand . . . . . . . . . . . . . . . . . . . . . . . . . . . . 530
 3. Sewer Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 533

 4. Assemblage ................................. 535
 5. Environmental Constraints .................. 536
 C. The Appellate Division Decision .................. 536

IV. The Mount Laurel Doctrine ......................... 539

V. The Certified Questions ............................ 548

 A. Whether the Trial Court Erred in Concluding
 that the Township Failed to Provide a Realis-
 tic Opportunity for the Development of Afford-
 able Housing and in Considering Market De-
 mand for Particular Housing Types in Making
 That Determination ........................... 549
 1. Market Demand ........................... 550
 2. Housing Yield ............................. 556
 3. Sewer Policies ............................. 557
 4. Summary ................................. 558
 B. Whether the Trial Court Erred in Holding
 that Toll Brothers is Entitled to a Builder's
 Remedy ...................................... 559

VI. Conclusion ....................................... 566

# I

## *Mount Laurel and Affordable Housing Litigation*

In 1975, this Court decided *Southern Burlington County NAACP v. Mount Laurel Township,* 67 *N.J.* 151, 336 *A.*2d 713, *cert. denied,* 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975) (*Mount Laurel I*). In that opinion, we held that developing municipalities are obligated under our State Constitution to provide a realistic opportunity for the development of low and moderate income housing.[1] *Id.* at 174, 187, 336 *A.*2d 713.

---

[1] Throughout this opinion, "low and moderate income housing" will be used interchangeably with "affordable housing." The FHA defines low income housing as

> housing affordable according to federal Department of Housing and Urban Development or other recognized standards for home ownership and rental costs and occupied or reserved for occupancy by households with a gross

Two years later, the Court created the "builder's remedy" as an "incentive for the institution of socially beneficial but costly litigation such as ... *Mount Laurel.*" *Oakwood at Madison v. Township of Madison*, 72 *N.J.* 481, 550–51, 371 *A.*2d 1192 (1977). The builder's remedy permitted builders to seek court approval for construction

> of the housing project they proposed to the township prior to or during the pendency of the action, pursuant to plans which, as they originally represented, will guarantee the allocation of at least 20% of the units to low or moderate income families.
>
> [*Id.* at 551, 371 *A.*2d 1192 (footnote omitted).]

Despite *Mount Laurel I* and the subsequent creation of the builder's remedy, the years that followed saw "many municipalities fail[ing] to comply with the clear mandate of *Mt. Laurel I.*" *Holmdel Builders Ass'n v. Township of Holmdel*, 121 *N.J.* 550, 555, 583 *A.*2d 277 (1990). Thus, in *Southern Burlington County NAACP v. Mount Laurel Township*, 92 *N.J.* 158, 456 *A.*2d 390 (1983) (*Mount Laurel II*), "[w]e clarified and reaffirmed the constitutional mandate set forth in *Mt. Laurel I,* imposing an affirmative obligation on every municipality to provide its fair share of affordable housing." *Holmdel, supra,* 121 *N.J.* at 555,

---

> household income equal to 50% or less of the median gross household income for households of the same size within the housing region in which the housing is located.
>
> [*N.J.S.A.* 52:27D–304c.]
>
> The FHA identifies moderate income housing as
>
> housing affordable according to federal Department of Housing and Urban Development or other recognized standards for home ownership and rental costs and occupied or reserved for occupancy by household with a gross household income equal to more than 50% but less than 80% of the median gross household income for households of the same size within the housing region in which the housing is located.
>
> [*Id.* at –304d.]
>
> Sites zoned to permit affordable housing may be referred to as "inclusionary development[s]" or "inclusionary site[s]." Under the FHA, inclusionary development refers to "a residential housing development in which a substantial percentage of the housing units are provided for a reasonable income range of low and moderate income households." *Id.* at –304f.

583 *A*.2d 277 (citing *Mount Laurel II, supra,* 92 *N.J.* 158, 456 *A*.2d 390).

Most relevant to the instant matter, the Court also clarified the conditions under which a builder's remedy may be granted. We began by acknowledging that "[b]uilder's remedies have been one of many controversial aspects of the *Mount Laurel* doctrine." *Mount Laurel II, supra,* 92 *N.J.* at 279, 456 *A*.2d 390. Notwithstanding that controversy, however, we found that "[e]xperience ... has demonstrated to us that builder's remedies must be made more readily available to achieve compliance with *Mount Laurel*." *Ibid.* Yet, because of concerns about land use planning, we urged the trial courts when formulating a builder's remedy to "make as much use as ... [possible] of the [municipal] planning board's expertise and experience so that the proposed project is suitable for the municipality." *Id.* at 279–80, 456 *A*.2d 390. We also cautioned that "[t]rial courts should guard the public interest carefully to be sure that plaintiff-developers do not abuse the *Mount Laurel* doctrine." *Id.* at 281, 456 *A*.2d 390.

## II

### *The Fair Housing Act and the Council on Affordable Housing*

On July 2, 1985, "the Legislature codified the *Mt. Laurel* doctrine, including its available compliance measures," by enacting the FHA. *Holmdel, supra,* 121 *N.J.* at 556, 583 *A*.2d 277. The FHA creates a new administrative agency, the Council on Affordable Housing (COAH), *N.J.S.A.* 52:27D–307, to oversee the development of low and moderate income housing throughout the state through a system of voluntary participation by municipalities in the COAH process. To carry out its function, the agency is authorized to adopt necessary rules and regulations. *Id.* at –307.5.

Under the FHA, COAH serves as an alternative forum for the resolution of *Mount Laurel* disputes. Municipalities facing *Mount Laurel* challenges may use the COAH mediation and review process, *id.* at –316b, or independently may seek COAH

review of their zoning and affordable housing regulations, *id.* at –314, in order to receive a measure of protection from future challenges. *See id.* at –317a. On a grant of substantive certification from COAH, *id.* at –314, a municipality's housing plan enjoys a ten-year [2] presumption of validity that may be overcome in subsequent litigation only by clear and convincing evidence.[3] *See id.* at –317a; *id.* at –313.

In *Hills Development Co. v. Bernards Township,* 103 *N.J.* 1, 25, 510 *A.*2d 621 (1986), this Court upheld the constitutionality of the FHA.

## III

### *The Prior and Present Litigation*

#### A. *The Prior Litigation*

This action represents "the second *Mount Laurel* suit initiated against defendant." *West Windsor, supra,* 303 *N.J.Super.* at 529, 697 *A.*2d 201. Previously, "[o]n March 14, 1984, Affordable Living Corporation had instituted exclusionary zoning litigation against [West Windsor] that resulted in a [1984 judgment] establishing

---

[2] The FHA was recently revised to require computation of municipal present and prospective regional fair share for a ten-year period. *N.J.S.A.* 52D–307c(1). Previously, "[f]or purposes of review, certification, and assessing fair share, COAH ha[d] specified six-year periods or 'cycles.'" *West Windsor, supra,* 303 *N.J.Super.* at 539, 697 *A.*2d 201 (citing *N.J.A.C.* 5:93–2.1 through –2.20). The first cycle "addresse[d] housing needs and municipal obligations" from 1987 to 1993 (Round I); the subsequent cycle covered 1993 to 1999 (Round II). *Ibid.*

[3] This protection is rooted in *Mount Laurel II,* in which we held that "[c]ompliance judgments ... shall have *res judicata* effect, despite changed circumstances, for a period of six years, the period to begin with the entry of the judgment...." *Mount Laurel II, supra,* 92 *N.J.* at 291–92, 456 *A.*2d 390 (footnote omitted). However, we also noted that "[a] substantial transformation of the municipality ... may trigger a valid *Mount Laurel* claim before the six years have expired." *Id.* at 292 n. 44, 456 *A.*2d 390. The COAH grant of substantive certification, then, is the equivalent of a trial court judgment of compliance and repose, each providing the municipality with a period of protection from *Mount Laurel* challenges. *See N.J.S.A.* 52:27D–313; *see also N.J.S.A.* 52D–307c(1).

defendant's fair share at 1,619 low and moderate income units."
*Ibid.* In 1985, that number was reduced to 1,453 units, and later,
on October 14, 1986, the 1985 judgment was "modified to conform
West Windsor's fair share housing obligation to that established
by [COAH]—592 units."[4] *West Windsor, supra,* 303 *N.J.Super.*
at 529, 697 *A.*2d 201.

To meet its original obligation, West Windsor adopted a housing
plan and various conforming zoning amendments. The amend-
ments addressed issues such as common open space, density and
residential-type distribution, affordable unit distribution and loca-
tional criteria, and expedited review of low and moderate income
developments. New zones "EH" (Elderly Housing), and "R3A,"
"R4A," and "R4B" (Residence Districts) were added, and eleven
sites were zoned for inclusionary development as follows: Sites 1
and 5A (120 affordable units), Sites 2 and 8 (312 affordable units),
Site 3 (twenty affordable units), Site 4 (thirty-four affordable
units), Site 5 (100 affordable units), Site 6 (the Toll Brothers
property—527 affordable units),[5] Site 7 (forty affordable units),
Site A (102 affordable units), and Site B (206 affordable units).

---

[4] Because COAH's methodology for calculating a municipality's fair share
differed from that of the trial court, the number of affordable housing units
required under COAH was significantly lower than the number required by the
court. See Jeffrey R. Surenian, *Mount Laurel II and the Fair Housing Act* 489–
91 (1987) (stating that "[a]lmost every change to the methodology implemented
by [COAH] ... had the effect of reducing the obligation of municipalities to
provide lower income housing"). We understand that COAH now is considering
other proposals for calculating fair share allocations during the third round of
municipal planning, *e.g.,* a growth share approach. COAH, *Growth Share As An
Adjustment, at* http://www.state.nj.us/dca/coah/polissue.htm (reporting discus-
sions about growth share approach and stating intent to "develop a third round
methodology that assigns affordable housing numbers and then offers growth
share as an implementation adjustment for new third round obligation numbers
only"). As that issue has not been raised by the parties below, we express no
opinion on COAH's allocation methodology.

[5] The trial court described the Toll Brothers site as "by far the largest
compliance site under single ownership" included in the plan. *Id.* at 533, 697
A.2d 201. The site was "proposed [to] ... realistically ... [provide] for con-
struction of a total of 2,480 family units," of which 496 would be low and

Those eleven sites were to provide a realistic opportunity for the development of 1,461 affordable housing units. Also, under the compliance plan West Windsor agreed to rehabilitate thirty-seven existing dwellings that, in the main, consisted of multi-family units. *Id.* at 532–33, 697 A.2d 201. In all, the plan provided for the potential development of 1,498 affordable units generally consisting of multi-family housing.[6] As described by the trial court in the opinion below, the plan

> rel[ied] almost exclusively on multi-family housing as the vehicle for development of inclusionary projects. Conventional single-family detached housing [was] generally not permitted in the inclusionary zones. The single-family detached housing that [was] permitted either must be located in a specialty zone, or it must be a novel product, e.g., zero lot-line homes[,] ... where one side of the house is windowless and lies directly on a side lot-line.
>
> [*Id.* at 554, 697 A.2d 201.]

In October 1985, the compliance plan was memorialized in a Judgment of Compliance and Repose, *id.* at 529, 697 A.2d 201, which was to remain effective for six years.

## B. *The Present Litigation*

On May 12, 1993, Toll Brothers filed this lawsuit alleging that West Windsor had engaged in a pattern of exclusionary zoning in violation of the New Jersey Constitution as interpreted in the

---

moderate income units. *Ibid.* (Although the number of units reported by the trial court differs from the number listed in the original compliance plan, the difference is not significant to the opinion.) Subsequent to the 1985 judgment, West Windsor and the then-owner of the site negotiated a revision to the number of units that this site could potentially produce.

[6] Again, the trial court reports a different sum for the eleven sites than that contained in the original compliance plan: "According to defendant's proposed *Mount Laurel II* compliance program, filed with the court prior to entry of the 1985 Judgment of Repose, defendant proposed to ... rezone a total of eleven sites that were said to provide a realistic opportunity for the production of 1,306 low and moderate income units." *Id.* at 532–33, 697 A.2d 201. It appears that that number did not include senior citizen units. Moreover, although the plan was 121 units short of West Windsor's 1,619-unit obligation, the Special Master recommended that "no modification in the compliance ordinance be imposed on the township...."

*Mount Laurel* cases and the FHA. *Ibid.* West Windsor's period of repose under the 1985 judgment had expired on July 21, 1991, and West Windsor had not applied to COAH for interim certification. *Id.* at 529–30, 697 *A.*2d 201. If granted interim certification, West Windsor would have been required to continue implementing the terms of the 1985 judgment and would have continued to enjoy the same measure of protection from litigation that was provided by that judgment. *Id.* at 529 n. 1, 697 *A.*2d 201 (citing *N.J.A.C.* 5:92–1.6(d) and 5:91–14).

West Windsor nonetheless continued to implement the 1985 court-approved plan, *id.* at 526, 697 *A.*2d 201, which "remained in effect essentially unchanged, until late summer 1994." *Id.* at 531, 697 *A.*2d 201. Of the eleven sites included in the 1985 judgment, however, only two actually had been developed by the time Toll Brothers instituted its *Mount Laurel* challenge—the Windsor Haven property (Site 3 from the 1985 judgment), which produced thirty-seven "for-sale" condominium units, and Steward's Watch (Site A from the 1985 judgment), which yielded 102 rental units. *Ibid.* During roughly the same period (1982–1994), however, "a massive amount of development of conventional single-family de-tached homes ha[d] occurred in non-inclusionary zones." *Id.* at 553, 697 *A.*2d 201. Specifically, "the number of houses in West Windsor Township more than doubled, increasing from 2,907 units to 6,115 units," with the purchasers generally moving into "high-priced, large-lot, single-family houses." *Id.* at 526, 697 *A.*2d 201.

Toll Brothers argued that West Windsor's "poor" development rate for the construction of affordable housing was due to a variety of factors, including: (1) the severe impact of environmen-tal constraints (*e.g.,* freshwater wetlands, freshwater wetlands buffers, and floodplain areas) on the developability of the sites zoned for affordable housing; (2) West Windsor's unduly cost-generative public sewer policies that required developers of inclu-sionary sites to provide and "front" the high costs of oversized and expensive gravity flow sewer systems; (3) public resistance to, and application processing delays regarding, development of sites

zoned for affordable housing (highlighted by the testimony of plaintiff's expert, who also had been the planner for the former owner, that when attempting to obtain development approval from the West Windsor Planning Board the developer was subjected to over fifty public hearings in three-and-one-half years, a delay that the trial court, in October 1987, found to be " 'unjustified,' 'purposeful or unexcusable' "), *id.* at 535–36, 697 *A.*2d 201; (4) West Windsor's failure, in its zoning of affordable housing sites, to include conventional single-family houses on small lots despite the demonstrated strong market demand for such units; and (5) West Windsor's other restrictive zoning standards and cost-generative ordinances, such as the requirement that 175 senior citizen affordable units be built on the Toll Brothers site "without regard to the number of market units built," *id.* at 536, 697 *A.*2d 201, as well as ordinances establishing the set-aside of an "unreasonable amount of common open and recreational space." *Ibid.* As the trial court summarized,

> plaintiff asks this court to look beyond the face of defendant's assertedly inclusionary zoning. It asks for consideration of numerous factors—environment, infrastructure, market demand, municipal policy and other zoning-related factors—for a finding that defendant is deficient in its affirmative duty under the *Mount Laurel* cases. It asks for a builder's remedy to permit development of its property in a more cost-effective, market-responsive manner than defendant's current zoning allows.
>
> [*Id.* at 537, 697 *A.*2d 201.]

The builder's remedy sought by Toll Brothers would necessitate the rezoning of the Toll Brothers site. At the time, the site was zoned PRN–1, which requires a mix of three housing types with no one housing type accounting for more than eighty percent of the total units. The permitted types were townhouses, garden apartments, patio homes, two-family rentals, maisonettes and zero lot-line single-family units. *Id.* at 526, 697 *A.*2d 201. The rezoning sought by Toll Brothers would allow it to construct 735 to 765 units, of which 625 to 650 would be conventional, market-rate, single-family detached houses on small lots and 110 to 115 units

would be affordable rental housing.[7] *Id.* at 526–27, 697 *A.*2d 201. Eighty percent of the affordable rental units would be single-family detached zero lot-line housing, with the balance a mix of conventional single-family detached houses on small lots, as well as a second unidentified housing type.

The trial court conducted a bench trial that began on September 28, 1994, and ended on March 29, 1995. *Id.* at 528, 530, 697 *A.*2d 201. The court relied primarily on the reports, exhibits, and testimony provided by Toll Brothers' experts, West Windsor's experts, and a court-appointed Special Master. For purposes of deciding whether Toll Brothers was entitled to a builder's remedy, the court held that West Windsor's "conduct," *i.e.*, its housing plan, zoning ordinances, regulations, and sewer policies, would be evaluated as of the date that Toll Brothers initiated its challenge. *Id.* at 531, 697 *A.*2d 201 (citing *Van Dalen v. Washington Township*, 205 *N.J.Super.* 308, 334 n. 11, 500 *A.*2d 776 (Law Div.1984)).

As a threshold matter, it was necessary for the trial court to determine West Windsor's present affordable housing obligation. For that purpose, the court turned to the numbers promulgated "by COAH in regulations that were first proposed on March 15, 1993, 25 *N.J.R.* 118 (March 15, 1993), and finally adopted on June 6, 1994, 26 *N.J.R.* 2300 (June 6, 1994)." *West Windsor, supra,* 303 *N.J.Super.* at 530, 697 *A.*2d 201. Those regulations established West Windsor's present obligation at 929 units of affordable housing. *Ibid.* Of that number, thirty units represented West Windsor's "indigenous need," which COAH defines as "deficient housing units occupied by low and moderate income households within a municipality. . . ." *N.J.A.C.* 5:93–1.3. The remaining 899 units represented West Windsor's new regional obligation. *West Windsor, supra,* 303 *N.J.Super.* at 530, 697 *A.*2d 201.

---

[7] The builder's remedy that eventually was granted approved Toll Brothers' revised plan for construction of 1,165 units, fifteen percent to be set aside as family-affordable rental units. The 1,165 units were to include 400 single-family detached units, 635 multi-family units, and 130 townhouses.

Under COAH's regulations, the 929–unit obligation was cumulative, *i.e.*, it covered both Round I and Round II, or the period from 1987 to 1999. Thus, West Windsor was credited with the 139 units that had been constructed on two sites during that period—thirty-seven units for the Windsor Haven parcel (Site 3 under the original compliance plan), and 102 units for the Steward's Watch property (Site A under the original compliance plan). *Id.* at 531–32, 697 *A.*2d 201. The trial court also credited West Windsor with 102 rental bonus credits for the development of Steward's Watch.[8] *West Windsor, supra,* 303 *N.J.Super.* at 532, 697 *A.*2d 201. In sum, the trial court concluded that "defendant ha[d] met 241 units of its 929–unit fair share housing obligation." *Ibid.* West Windsor's remaining obligation was 688 units. Because West Windsor's original compliance plan "remained in effect, essentially unchanged, until late summer 1994," *id.* at 531, 697 *A.*2d 201, the "sole means of meeting ... [that 688 unit] obligation was the inclusionary zoning of nine remaining sites" contained in the original compliance plan and 1985 judgment. *Id.* at 532, 697 *A.*2d 201.

Before evaluating the viability of those sites, the trial court considered which party should bear the burden of persuasion in respect of the realistic development potential of those nine undeveloped sites. West Windsor argued that the burden of persuasion must rest with Toll Brothers, in keeping with the general presumption of validity afforded municipal ordinances. *Id.* at 548, 697 *A.*2d 201 (citing *Zilinsky v. Zoning Bd. of Adjust.,* 105 *N.J.* 363, 368, 521 *A.*2d 841 (1987)). Toll Brothers, on the other hand, contended that "in a 'second round' case, a substantial burden rests with defendant, who must explain the prior cycle sites' failure to develop." *Ibid.* As the trial court observed, West Windsor "received prior credit for [those] ... sites, and ... [yet,]

---

[8] Under *N.J.A.C.* 5:93–5.15(d)1 to –5.15(d)2, COAH outlines its bonus credit system for rental units. For every one rental unit made available to the general public, COAH grants the municipality two units of credit, *id.* at –5.15(d)1; age-restricted rental units produce 1.33 units of credit. *Id.* at –5.15(d)2.

so little inclusionary development has taken place over an extended period of time—here, ten years—despite significant development of the single-family housing market." *Id.* at 528, 697 *A.*2d 201.

To resolve that issue, the trial court followed the mandate of *Mount Laurel II*, a case that involved a second round of litigation between the same parties, and ruled that

"[p]laintiff may continue to prove ... that the land use regulations fail to provide a realistic opportunity for low and moderate income housing or that they contain 'expressly prescribed requirements or restrictions which preclude or substantially hinder it.' *Mount Laurel I*, 67 *N.J.* at 180–81, 336 *A.*2d 713. As before, such a showing shall create a *prima facie* case of a failure to satisfy the *Mount Laurel* obligation. The municipality shall then have the heavy burden of demonstrating, by a preponderance of the evidence, its fair share and its satisfaction of that share or *any justification of its failure.*"

[*Id.* at 549, 697 *A.*2d 201 (quoting *Mount Laurel II, supra,* 92 *N.J.* at 222–23, 456 *A.*2d 390) (emphasis added by trial court).]

The court then concluded:

Although the affordable housing plan and inclusionary sites at issue here have not previously failed any test of compliance in court, they have now failed the test of time. Since the prior judgment of compliance was entered approximately one decade ago, most of defendant's inclusionary sites have failed to develop despite a housing boom. Defendant's affordable housing plan enjoyed a presumption of validity through the first cycle; defendant must now, in this second cycle, explain why the sites have failed to produce housing. Although plaintiff bears the burden of coming forward and presenting a *prima facie* case as to sites not previously credited, defendant bears the burden of explaining the failure to develop sites for which it received credit ten years ago.

[*Id.* at 550, 697 *A.*2d 201 (footnote omitted).]

Despite that conclusion, the trial court found that Toll Brothers had "developed sufficient facts" so that "[e]ven if the burden did not shift, plaintiff ha[d] successfully met the burden in its case." *Id.* at 550 n. 5, 697 *A.*2d 201.

Having disposed of those preliminary matters, the court considered whether West Windsor had provided a realistic opportunity for development of its present 688–unit affordable housing obligation. The court conducted a site-by-site analysis of the parcels zoned for affordable housing by evaluating (1) unnecessary cost-generating site development standards unrelated to health or

safety, (2) restrictions on the type or mix of housing permitted, *id.* at 542, 697 *A.*2d 201 (3) infrastructure requirements relating to "public water, sanitary sewers, or roads, which may unnecessarily increase costs of development," *id.* at 542–43, 697 *A.*2d 201 (4) environmental constraints, *id.* at 543, and 697 *A.*2d 201 (5) access to water and sewer services at a reasonable cost. *Ibid.* The court also indicated that it would hear testimony from site owners that express a willingness "to develop inclusionary housing, or to sell the property to a developer who will do so." *Ibid.* (citing *Mount Laurel II, supra,* 92 *N.J.* at 297–99, 456 *A.*2d 390). That approach, as the court pointed out, is consistent with COAH's definition of "realistic opportunity." *Id.* at 544, 697 *A.*2d 201 ("When reviewing assertedly inclusionary zoning, COAH '[s]hall include but not be limited to a consideration of environmental factors, the location of existing infrastructure and the likelihood of the current zoning to result in the creation of low and moderate income housing during the period of substantive certification.' ") (quoting *N.J.A.C.* 5:93–3.5).

The court also observed that "[e]xcept as to the new NJIT and PRRC zones, defendant's zoning plan does not have conventional single-family detached housing as permitted uses within inclusionary developments." *Id.* at 556–57, 697 *A.*2d 201. Because West Windsor's housing plan relied heavily on zoning for multi-family units and on unconventional zero lot-line single-family detached housing, *id.* at 536, 697 *A.*2d 201, for which Toll Brothers contended there was little market demand, and because the housing type allegedly in greatest demand—conventional single—family units on small lots-was generally precluded under West Windsor's inclusionary zoning plan, *id.* at 536, 571, 697 *A.*2d 201, the court carefully examined that issue. Finally, the court declined generally to include in its evaluation those sites that required assemblage in order to satisfy West Windsor's zoning requirements and other regulations. *Id.* at 528, 697 *A.*2d 201.

In conducting its site-by-site analysis, the trial court considered the projected affordable housing yields submitted by the parties'

experts and the Special Master, ultimately choosing to follow closely the low yield calculation of 501 affordable units submitted by the Special Master. Although the low yield approach assumed construction of the "novel" and "unconventional" single-family housing permitted under West Windsor's existing zoning ordinances, *i.e.*, zero lot-line units, that housing more closely resembled the housing type for which there existed the greatest market demand—conventional single-family detached units. See *id.* at 554, 697 *A.*2d 201. By comparison, the high yield approach assumed development of primarily multi-family housing that the court determined "control[led] only a minute fraction of the market." *Id.* at 545, 571–72, 697 *A.*2d 201. The court's analysis and conclusions appeared in the unreported portion of its opinion,[9] and are summarized below.

### 1. *Site–by–Site Evaluation*
#### *Site 1*

Site 1 is an undeveloped site in West Windsor's original compliance plan and 1985 judgment. Under that plan, it was anticipated that Site 1, together with Site 5A, would yield 120 affordable units.[10] The trial court noted that no credible evidence was put forward that any development proposal for the two sites had been presented to West Windsor in the nine years since the adoption of the compliance plan. Further, the Special Master advised that defendant had not submitted a certification affirming the site's continued viability as inclusionary.

Although Site 1 consists of 40.2 acres, located in an R–5 zone, the court found that only 24.5 acres were developable due to

---

[9] Both the trial court and the Appellate Division opinions contained published and unpublished portions. Citations to the unpublished opinions are not provided.

[10] All references to the number of affordable units each site was to yield under the original compliance plan are generated from information submitted by both parties' experts.

environmental constraints, open recreation space requirements, and storm water detention needs. The court held that 14.4 units could be built on each acre, yielding a total of 353 units, of which seventy-one would be "affordable" assuming a twenty percent set-aside.

### Site 2

Site 2, also an undeveloped site included in the original compliance plan, was expected to yield 312 affordable units when coupled with Site 8. West Windsor did not offer any explanation for why this site had not yet been developed. The trial court found that the number of affordable units that could be developed on the site was affected substantially by market demand because the potential yield would vary depending on the type of unit a developer chose to build.

The need for assemblage, as well as storm water and open space requirements, also affected the number of units that realistically could be developed on this site. Site 2 was described as an unassembled multiple lot parcel located in an R–4B zone that allows for single-family, zero lot-line, detached dwellings; two family and semi-detached dwellings; townhouses; and garden apartments. The site consists of 199.3 acres, of which only 53.3 acres are located in an environmentally unconstrained area. The court found that, without assemblage, realistic development was possible only on three lots—48, 11.02, and 15.

The Special Master reported on the minimum and maximum number of affordable units that each lot could yield, depending on the type of units built and the percentage of units set aside for affordable housing. His report indicated that Lot 48, the largest of the three lots, could yield somewhere between thirty-four and 108 affordable units; that Lot 11.02 could yield between six and thirty-one units; and that Lot 15, absent assemblage, could not yield any affordable units because it was a "severely constrained parcel" with road access difficulties and an "obvious problem of a lack of economy of scale." The court held that Site 2 as a whole

could provide a total of forty-five affordable units (thirty-four for Lot 48 and eleven for Lot 11.01).

### Site 5 (Exxon)

Site 5 is another undeveloped parcel in the original compliance plan, where it is designated as appropriate for the development of 100 senior affordable units. The site was eliminated because "[a]ll parties and experts agree[d] that no credit [was] appropriate for Site 5," and because "[t]here [were] too many preconditions [to] be met before this site [could] be completed."

### Site 5A (La Placa)

Site 5A also is an undeveloped site included in the original compliance plan, under which that site and Site 1 were expected to yield a total of 120 affordable units. In the plan, Site 5A contained 10.32 acres and was zoned to allow only multi-family housing. The site subsequently was rezoned R–5B, which also permits "only multifamily development" restricted to "garden apartments, townhouses or maisonettes." The rezoning "increas[ed the site's] allowable density to fifteen units per acre conditioned upon a forty percent affordable housing setaside." An adjacent, partially developed property also was added, increasing the size of the parcel to twenty-two acres.

The trial court, in rejecting defendant's claim that ninety-six affordable units could be built on Site 5A, pointed out that defendant's estimate "assume[d] construction under the Low Income Tax Credit Program," which all parties agreed is "extremely competitive and requires that all municipal approvals be in place." The court observed that the developer's attorney had testified at trial that neither the municipal approvals nor the tax credits had been secured, and that the developer was "reluctan[t] to build a 'conventional' multifamily inclusionary development." After consideration of those factors, the court held that the Special Master's twenty-nine unit yield estimate was realistic for this site, "assuming there is market demand," and credited West Windsor accordingly.

### Site 6 (Toll Brothers)

Site 6 was assigned 527 affordable units in the original compliance plan. Subsequent to the 1985 judgment, West Windsor and the previous owner negotiated a revision to the number of units that the site potentially could produce. Specifically, those parties agreed that Site 6 would yield 315 affordable units. In 1988, they again agreed to a reduction in the number of affordable units for this site, this time from 315 to 225 units, but because they did not seek the necessary court approval the trial court determined that that agreement was no longer in effect.

Site 6, zoned PRN–1, consists of 222.1 undeveloped acres. The PRN–1 zone requires a "mix of three housing types with no single housing type accounting for more than eighty percent of the total units." The Township estimated that this site could produce 1,500 units, of which 300 would be set aside for affordable housing. Those numbers were based on a proposal put together by the site's prior developer, "Countryside." The Special Master, however, rejected that estimate, noting that Countryside's proposal had called for only 225 affordable units, and that in any event new wetlands regulations had been adopted subsequently that "ma[de] additional constraints and [yield] reductions likely." In his view, the site's low to moderate yield range was 169 to 225 affordable units. After considering market demand and rejecting the notion that the site would develop at maximum density, the court found that the low yield estimate of 169 affordable housing units was the most realistic.

### Site 7

Site 7 is an undeveloped property in the original plan that was estimated to yield forty affordable units. That number was reduced later to twenty-four units. The site consists of multiple lots, is twenty-nine acres in size, and is located in an R–4B zone. The trial court found that due to various constraints and development limitations, the only viable lot was Lot 31, which contained only 2.8 acres of developable area. Even though the court questioned whether Site 7 would yield any inclusionary development

whatsoever, it accepted three affordable units for the purpose of its analysis.

### Site 8

Site 8 also is an undeveloped site that was part of the original compliance plan and, together with Site 2, was to provide 312 affordable units. The site consists of nine lots totaling 64.32 acres, with a developable area of 38.12 acres. West Windsor's expert projected that as a whole this site would yield 504 garden apartment units, of which 101 would be affordable. The court's Special Master observed that the expert's estimate assumed both full assemblage and "that the market could sustain garden apartments." He reported that the site consists of two "zones," with separate zoning designations, and that there were assemblage issues in connection with lots in the second zone.

More specifically, the first zone contains four lots—1, 2, 8, and 166—that the Special Master found might reasonably be expected to develop together. The second zone contains five lots—13, 14, 15, 16, and 34. Lots 13, 15, and 34 are under common ownership, Lot 16 is owned by West Windsor, and a private entity (different from the owner of Lots 13, 15, and 34) owns Lot 14. The "estimated site area" for the five lots is twenty-three acres, as to which the Special Master noted that "only about 10.5 acres are [located] in upland." The Special Master also stated that it was crucial that all five lots be assembled for there to be a realistic chance that affordable housing would be constructed because separate developments would present considerable road access problems.

Taking into account the assemblage issues, and cognizant of the concern expressed by plaintiff's expert about " 'the availability of sanitary sewer services to this site,' " the court concluded that "the potential affordable housing yield for this site ranges from twenty-nine units to seventy-eight units, depending on the type of housing and assuming market demand." Twenty-nine units were credited.

### Site B (Copperfield)

Site B is an undeveloped property that had been included in the original compliance plan for the development of 206 affordable units. That estimate was later reduced to 100 units in 1990. The site consists of 165 acres that are zoned for a mix of housing types.

Three issues affect the development of affordable housing on this site. First, the Department of Environmental Protection had not clarified the boundaries of the relevant wetlands area; second, the cul-de-sac design does not comply with state or local standards; and third, the extensive reliance on multi-family units is problematic. The trial court expressed its concern that the low demand for multi-family units coupled with the early development of such units on other sites could reduce the prospects for this site and elsewhere. Regardless, the court assumed that the planned multi-family and unconventional units would be marketable, and concluded that the site realistically could yield sixty-four affordable units.

### Site R–3A

Site R–3A was not included in the original plan but nevertheless was considered by the Special Master and the trial court. The site consists of 109.90 acres, covering multiple lots with a net developable area of seventy acres. One lot, known as the Maycho parcel, had received preliminary approval in 1989, but the approval never was made final. Nonetheless, the Special Master recommended, and the trial court agreed, that this lot could generate three or four units. The court also found that Lot 14 could yield four affordable units, and determined that Lots 15, 27, 55, and 56 were not suitable for development. In sum, the court concluded that Site R–3A could yield up to seven or eight affordable units. West Windsor was granted an eight unit credit for this site.

### Site PRRC

The PRRC site, located in a new zoning district created during the course of the trial, was not part of the original compliance

plan. Nevertheless, the trial court included this site in its analysis.

The site contains approximately 400 acres, 150 of which defendant claimed were developable. According to defendant's expert, this site could yield 580 single-family, detached units, of which eighty-seven would be affordable units (assuming a fifteen percent set-aside). The Special Master, however, reported that five open space and recreational area ordinances limited development to 111 of the site's acres. He added that the 111 acres theoretically could accommodate 580 single-family units at full build-out, but that the resulting density would make the construction of townhouses or apartments more appropriate (and likely). Nonetheless, the Special Master assumed, and the trial court agreed, that "the yields can be achieved with single-family dwellings and that 87 low/mod units will be provided in this zone."

### Site NJIT

Site NJIT was not part of the original plan. The site was one of only two sites for which West Windsor's new zoning ordinances "provided inclusionary developers with the option of constructing conventional, single-family detached units." *West Windsor, supra,* 303 *N.J.Super.* at 554, 697 *A.*2d 201. Because "the NJIT zone was designed for a specific government-sponsored project," *ibid.,* the trial court concluded that the site would yield no affordable housing units.

### Summary

Based on its extensive and careful evaluation of those sites, the trial court found that the maximum potential affordable housing yield was 505 units, 183 units short of defendant's obligation of 688 units.[11] Having determined that West Windsor was not in compli-

---

[11] The number of units credited for each site was as follows: Site 1 (seventy-one units), Site 2 (forty-five units), Site 5 (zero units), Site 5A (twenty-nine units), Site 6 (169 units), Site 7 (three units), Site 8 (twenty-nine units), Site B (sixty-four units), Site R–3A (eight units), Site PRRC (eighty-seven units), and Site NJIT (zero units). Although the trial court initially indicated that it would consider

ance with its present affordable housing obligation, the trial court awarded Toll Brothers a builder's remedy for its site, the specifics of which were to be subsequently determined. *Id.* at 576, 697 *A.*2d 201. The court also retained jurisdiction "over remediation of defendant's housing plan as a whole, including the appointment of a special master." *Ibid.* West Windsor's failure to meet its present obligation was attributed to a lack of market demand for the housing types permitted under the existing zoning (particularly multi-family and zero lot-line single-family housing), *id.* at 573, 697 *A.*2d 201; West Windsor's requirement that developers of sites zoned for affordable housing "front" the costs of a gravity-fed sewage system (instead of permitting the use of a less-expensive pumped system), *id.* at 528, 697 *A.*2d 201; the reality that unlikely-to-occur multiple lot assemblage was necessary for certain sites to comply with West Windsor's zoning ordinances and other regulations, *ibid.;* and, the impact of environmental constraints, *ibid.,* as well as certain of West Windsor's other development requirements such as open space "set-asides." *Ibid.*

### 2. *Market Demand*

The West Windsor sites examined by the trial court were zoned almost exclusively for the construction of multi-family units and unconventional zero lot-line single-family detached housing. *Id.* at 554, 697 *A.*2d 201. In fact, none of the nine undeveloped sites that was included in the original compliance plan permitted the construction of conventional single-family detached housing. *Id.* at 556–57, 697 *A.*2d 201. Recognizing that West Windsor's zoning for multi-family housing was, at least superficially, in accord with the method historically used by "both developers and the courts to implement the *Mount Laurel* requirements," *id.* at 527, 697 *A.*2d 201, the court framed the issue before it as whether that "model"

the nine undeveloped sites from the original compliance plan, *id.* at 531, 697 *A.*2d 201, only eight sites were discussed separately. West Windsor's expert listed Sites 4 and 6 as one parcel (Site 6 is the Toll Brothers site). Apparently, the court's analysis of Site 6 also incorporated Site 4.

may be modified based on evidence of a lack of market demand for multi-family housing and a strong demand for conventional single-family dwellings. *Id.* at 527–28, 697 *A.*2d 201.

Initially, the court decided that it was proper to consider housing-type market demand as a factor in determining whether West Windsor had provided a realistic opportunity for the development of affordable housing. *Id.* at 545, 697 *A.*2d 201. Nonetheless, sites zoned to permit a housing type for which there is little market demand would not be excluded automatically as incapable of producing affordable units. *Ibid.* Instead, the court would examine West Windsor's "inclusionary zoning scheme as a whole to determine whether anticipated inclusionary development is grounded in reality, or whether it is indeed a 'phantom.'" *Ibid.*

In undertaking that examination, the court observed that whether a site zoned for affordable housing actually provides a realistic opportunity for such housing to be built necessarily involves an inquiry into whether the site, as presently zoned, generates a favorable cost/benefit calculation. *Id.* at 546, 697 *A.*2d 201. The court explained further that

> the question of marketability after costs [of building], and thus market demand, has always been a [proper] consideration [for the realistic development opportunity inquiry], implicitly if not explicitly. If this were not the case, municipalities could engage in exclusionary zoning by simply zoning extensively for "inclusionary" development of a housing type for which there is little or no demand. Neither the Supreme Court nor COAH contemplated or would tolerate such a result.
>
> [*Ibid.*]

In support of its consideration of market demand, the court cited the FHA and various COAH regulations. For example, *N.J.S.A.* 52:27D–311a directs municipalities, when developing housing elements, to consider "'[r]ezoning for densities necessary to assure the economic viability of any inclusionary developments.'" *West Windsor, supra,* 303 *N.J.Super.* at 546, 697 *A.*2d 201 (quoting *N.J.S.A.* 52:27D–311a). Further, COAH's regulations incorporate similar considerations. In particular, *N.J.A.C.* 5:93–5.6 provides that COAH's review of municipal inclusionary zoning shall include an inquiry into "'the present ability of a

developer to construct low and moderate income housing at a specific density.'" *West Windsor, supra,* 303 *N.J.Super.* at 546–47, 697 *A.*2d 201 (quoting *N.J.A.C.* 593–5.6). COAH explains that *N.J.A.C.* 5:93–5.6 "'*recognizes that housing markets change* and by permitting some zoning at higher densities *land will be available to accommodate changes in housing demand.*'" *West Windsor, supra,* 303 *N.J.Super.* at 547, 697 *A.*2d 201 (quoting 25 *N.J.R.* 5787 (Dec. 20, 1993)) (emphasis added by trial court). Moreover, COAH has stated that

"*N.J.A.C.* 5:93–5.6(b) does not establish an inflexible standard that requires all sites to be zoned for a single-family inclusionary product. The rule establishes criteria that should be considered by the municipality and will be considered by [COAH] in determining the appropriate zoning for a specific site. *The factors to be considered include land use planning considerations and a consideration of the current market.* After consideration of these factors, [COAH] may require that a substantial percentage of inclusionary sites be zoned to allow market units within an inclusionary development to be constructed as single-family detached units."

[*West Windsor, supra,* 303 *N.J.Super.* at 546–47, 697 *A.*2d 201 (quoting 26 *N.J.R.* 2304 (June 6, 1994)) (emphasis added by the trial court).]

The trial court concluded that "COAH has definitively indicated that market demand is an appropriate factor to consider when addressing *Mount Laurel* compliance issues." *Id.* at 548, 697 *A.*2d 201.

Extensive information was submitted by both the parties and their experts on the question of market demand for various housing types, particularly multi-family housing in West Windsor and the surrounding area. The trial court reviewed data relating to building permits issued, the inventory of approved but unconstructed units, the zoning of vacant unapproved land, the vacancy rates of constructed units, the absorption rates of units coming onto the market, and demographic data. *Id.* at 566, 697 *A.*2d 201. After considering the information presented, and the parties' arguments, the court concluded that multi-family housing is "a product-type for which there is little actual or projected demand" in West Windsor. *Id.* at 557, 697 *A.*2d 201. According to the court,

the testimony presented by both parties leads to the conclusion that the present cycle period of the market calls for greater use of single-family dwellings as part of

the product available for inclusionary sites. An analysis of the competing experts' data and opinions supports the view that the over-reliance on multi-family housing as the method of producing inclusionary housing has had only limited success in the past and has questionable viability in the future. Clearly, the housing demographics for West Windsor have changed during the past cycles and changes will continue into the future. A municipality must respond to these changes if it is to fulfill its affirmative obligation to provide a realistic opportunity for inclusionary development.

[*Id.* at 571–72, 697 A.2d 201.]

Specifically, the court found significant that even though market demand might exist to support the construction of multi-family housing on an individual site, it would be "wholly unrealistic" to assume that "a majority of numerous sites" zoned for multi-family housing also would be developed. *Id.* at 545–46, 697 A.2d 201. Simply put, West Windsor's almost exclusive reliance on multi-family housing, despite the slight demand for such housing, provided little or no incentive for the owners of inclusionary sites to commence development. *See id.* at 546, 697 A.2d 201. The court cautioned, however, that

[t]he endorsement and recognition of affordable, small-lot, single-family detached housing unconstrained by artificial restrictions, e.g., the zero lot-line requirement, should not be interpreted as condoning a return to the large-lot, single-family dwellings that have historically been condemned as an exclusionary device. The product that must be permitted by defendant is an *affordable* product (in the common sense of the word) that will stimulate the construction of additional affordable housing consistent with the *Mount Laurel* doctrine. Municipalities and developers must not construe this result as a license to regress and abandon the basic constitutional underpinnings of *Mount Laurel.* The use of appropriate market products—here single-family dwellings—must be viewed not as a return to the past, but an impetus for growth in the future.

[*Id.* at 573, 697 A.2d 201 (emphasis added by the trial court).]

### 3. *Sewer Policies*

In reaching its conclusion that West Windsor's sewer construction and financing requirements were unduly cost-generative, and thus a disincentive to development, the trial court discussed the difficulties facing the developers of Sites 1, 2, 5A, 6, 7, and 8, the six inclusionary sites "dependent on the extension of [the] Duck Pond Run [Interceptor]." Developers of those sites were required to provide a gravity fed system that would be "deeper and more

expensive than a pumped system." Further, the developers had to oversize the system to accommodate possible future development, and at least initially were required to absorb all of the costs associated with the system.

Plaintiff's and defendant's experts differed on the actual dollar amounts required to serve those sites, especially in respect of "soft costs," such as acquisition, engineering, and legal fees. Toll Brothers' engineer testified that the cost of running the sewer line to each of the inclusionary sites in the Township's plan ranged from $553,587 to $3,880,141. By way of example, Toll Brothers estimated that the PRRC site "would involve front end costs of well over $3,000 per inclusionary unit and $15,000 per market rate unit." Plaintiff's expert offered testimony, which the court accepted as accurate, that a "front-ended" cost of more than $1,500 per unit "is excessive and constitutes a serious impediment to development of *Mount Laurel* housing."

West Windsor did not agree that its policies were unduly cost-generative and a disincentive to development, arguing that the inclusionary sites did indeed "have access to water and sewer infrastructure" by means of West Windsor's construction program for two interceptors—the Delaware and Raritan Canal Interceptor and the North Branch of the Duck Pond Run Interceptor. Under that program, extensions to the line were to be constructed by developers, "with a cost-sharing arrangement among them." West Windsor contended that its "system works well and . . . that it is reasonable to expect that the line will continue to be built." It informed the court that, as of the time the original compliance plan was developed, "the line's terminus was west of Route 1, approximately 13,800 feet, or almost three miles, from the closest *Mount Laurel* site—the La Placa site" (Site 5A), whereas "the line is now on the east side of Route 1 and 900 feet from the La Placa site" because of development in the interim and the consequent construction of the line. Based on that history, the Township anticipated that the line would continue to be "extended during this fair share period on the basis of prospective development

activity along the unbuilt portion of the line." For that to happen, however, the six inclusionary sites would have to develop sequentially, with the site closest to the existing line (Site 5A) developing first. If that occurred, construction costs would be minimized because each property would be responsible only for extending the line from an adjacent property. The trial court rejected that scenario as "conjecture" that "cannot be a basis for affirmatively providing a *realistic* opportunity for the development of affordable housing."

West Windsor's Township Engineer testified that even though West Windsor's "reimbursement plan require[d] significant 'front' money ... [that] add[ed] to the costs of development[,] ... waivers [could be] granted ... [if] 'there [is] no feasible alternative.'" Toll Brothers' expert however, "pointed out that while defendant had granted a number of waivers ... to developers elsewhere in the Township, such waivers had not been granted to inclusionary developers along Duck Pond Run." The court concluded that it did not find·the testimony offered by the Township Engineer to be credible, but "[m]ore to the point, inclusionary developers should not be dependent on municipal waivers or variances."

In sum, the court found the cost estimates of the Toll Brothers' engineer to be "reasonable and conservative," and agreed with the Special Master's assessment that West Windsor's sewer financing plan "'appears to discourage housing production and is cost-generative.'" The court added that "[t]he impact of defendant's sewer program in the context of this case is that it serves as a significant impediment to providing a 'realistic opportunity' for inclusionary housing construction."

### 4. *Assemblage*

The court found that land assemblage affected the development potential of Sites 2, R–3A, 7, and 8. The housing projections and yields calculated by West Windsor's expert "assume[d] development of these zones as if they were in single ownership." Nota-

bly, that the parcels in Sites 2, R–3A, 7, and 8 were in different ownership was "disclosed only as a result of plaintiff's expert report and cross-examination." The court concluded that what is required by the *"Mount Laurel* mandate, the Fair Housing Act and COAH rules ... is a *site* specific evaluation," citing for support "COAH's rule that sites [and not merely "zones"] be developable, suitable, approvable and available...." Because under West Windsor's expert's projections the sites could not be approved unless they were assembled, the court held that "[t]he sites where assemblage is a significant issue are ... not 'approvable.' "

### 5. *Environmental Constraints*

The Special Master recognized that environmental constraints must be considered "in order to properly assess site yields and potential unit counts in [West Windsor's] inclusionary zones." Thus, he required that West Windsor furnish "environmental documentation and site yield plans for each site." West Windsor objected to that requirement, describing it as "excessive" and in conflict with COAH's regulations, under which, it argued, site yield calculations would have been based simply on the "gross density of the total tract." The trial court determined that some environmental constraints existed on most of the sites. In light of that fact, the court concluded that "a site yield based on allowable gross density alone would not reflect the reality of the sites."

### C. *The Appellate Division Decision*

The Appellate Division affirmed the trial court's decision

substantially for the reasons expressed by Judge Carchman in his comprehensive reported opinion and in the unreported portion of the opinion dated October 16, 1996. The judge's findings of fact are supported by substantial credible evidence in the record[,] ... [and h]is conclusions, based on those findings, are legally sound.

[*West Windsor, supra,* 334 *N.J.Super.* at 111–12, 756 *A.2d* 1074 (internal citation omitted).]

In an unpublished portion of its opinion the appellate court also addressed "issues not raised below and those which arose after

Judge Carchman delivered his reported opinion." [12] *Id.* at 112, 336 *A.*2d 713. Most relevant to the instant matter, West Windsor argued before the appellate tribunal that "Toll Brothers was not entitled to a builder's remedy because it failed to act in good faith." The Township claimed that under *Mount Laurel II*, "good faith" is a prerequisite for the granting of a builder's remedy. More specifically, West Windsor relied on the following language from *Mount Laurel II, supra,* 92 *N.J.* at 218, 456 *A.*2d 390, quoted and emphasized by the Appellate Division in its unpublished opinion:

> Builder's remedies will be afforded to plaintiffs in *Mount Laurel* litigation where appropriate, on a case-by-case basis. *Where the plaintiff has acted in good faith,* attempted to obtain relief without litigation, and thereafter vindicates the constitutional obligation in *Mount Laurel*-type litigation, ordinarily a builder's remedy will be granted. . . .

The Appellate Division rejected West Windsor's argument, noting that Toll Brothers had met the three requirements for a builder's remedy—"(1) it succeed[ed] in *Mount Laurel* litigation, (2) it propose[d] a project with a substantial amount of affordable housing, and (3) [its] site is suitable, *i.e.*, the municipality fail[ed] to meet its burden of proving that the site is environmentally constrained or construction of the project would represent bad planning." The court further observed that it was "unaware of any case where a builder has met the three-prong [builder's

---

[12] The court evaluated and rejected the Township's allegations of trial court error due to: (1) not allowing West Windsor to present evidence and conduct cross-examination on the issue whether certain of its ordinances were unduly cost-generative; (2) applying "legally erroneous standards" when making the determination that certain ordinances were unduly cost-generating; (3) arbitrarily authorizing a fifteen percent affordable unit set-aside instead of a twenty-percent set-aside; (4) failing to find that Toll Brothers could have utilized a pump station for a portion of the site; (5) failing to require Toll Brothers to provide more recreational space; (6) unduly "intrud[ing] upon the municipal planning and zoning prerogatives of the Planning Board and governing body by ordering them to adopt the builder's remedy ordinance;" and (7) "failing to make specific factual findings on Toll Brothers' plan to build a substantial number of multi-family [units] on the site when it had previously asserted that only single-family dwellings are marketable."

remedy] test and failed to act in good faith," and acknowledged the difficulty, in any event, of " 'proving that a suit has been brought unnecessarily or as a leverage mechanism.' "

Nonetheless, the court conducted a review of the record and failed to find evidence that Toll Brothers had acted in bad faith. Most significant, it recounted that

[b]eginning in September 1992, Toll Brothers corresponded with the Planning Board concerning a plan for developing site 6 with 670 single-family dwellings, which would generate 100 affordable units. In December 1992, it presented the Board with a conceptual plan for 671 single-family dwellings, fifty affordable rental units and satisfaction of the additional fifty units through a Regional Contribution Agreement. Thereafter, Toll Brothers withdrew its request to rezone the property because the Township's interest and cooperation began to diminish in December 1992, and the Township Planner's report of March 17, 1993, was highly critical and completely unsupportive of the rezoning proposal. Throughout the summer and fall months of 1993, Toll Brothers continued communications with the Planning Board, cautioning that amended zoning ordinances would be necessary to implement the project. During case management conferences, Toll Brothers' counsel stated that it would very much like to "settle the case[.]" ... Clearly, it was to Toll Brothers' advantage to reach a settlement, rather than commit to several years of litigation.

The Appellate Division then rejected West Windsor's argument that Toll Brothers should have sought a variance for its proposed development, stating that that contention was of "dubious merit," given the "size of the property, its importance in the Township's compliance plan and the number of variances needed to build conventional single-family dwellings. . . ."

West Windsor petitioned for certification from this Court, which was granted in part. *West Windsor, supra,* 167 *N.J.* at 599, 772 *A.*2d 914; *West Windsor, supra,* 167 *N.J.* at 600, 772 *A.*2d 914. By our Order, we limited certification to the following issues:

(1) whether the trial court erred in concluding that the Township's ordinances, regulations, and site factors prevented a realistic opportunity for development of affordable housing;

(2) whether the trial court erred when it considered market demand for particular housing types when it determined that the Township failed to provide a realistic opportunity for development of affordable housing; and

(3) whether the trial court erred in holding that Toll Brothers was entitled to a builder's remedy.

[*West Windsor, supra,* 167 *N.J.* at 599, 772 *A.*2d 914; *West Windsor, supra,* 167 *N.J.* at 600, 772 *A.*2d 914.]

Subsequently, various parties were granted permission to participate as *amici curiae,* including the American Planning Association and its New Jersey Chapter; the New Jersey State League of Municipalities; New Jersey Builders Association and National Association of Home Builders; the Southern Burlington County NAACP, the Camden County NAACP, and the Fair Share Housing Development; and the Housing and Community Development Network of New Jersey, the Coalition for Affordable Housing and the Environment, the Association of New Jersey Environmental Commissions, the Regional Planning Partnership, and the New Jersey Future (collectively represented by the Rutgers Environmental Law Clinic). Those *amici* raise a number of issues in addition to the three questions certified by this Court, including, among others, that households earning less than forty-five percent of the median income are excluded from affordable housing; that attorneys fees should be awarded to successful non-profit *Mount Laurel* plaintiffs; that regional contribution agreements have exacerbated racial segregation and violate federal and state laws against discrimination; that COAH should make better use of public sector programs and non-profit developments; and that COAH should employ a growth share method to calculate fair share obligations. Although we appreciate the importance of the concerns raised, those issues are not before the Court and will not be considered in this case. *R.* 1:13–9. We would be reluctant to review matters of such consequence in any case where a record had not been fully developed by the parties in the trial courts, and where COAH, the agency whose regulatory policies are implicated, was not a participant.

## IV

### The Mount Laurel Doctrine

When this Court decided *Mount Laurel I* in 1975 "[t]here [was] not the slightest doubt that New Jersey ha[d] been, and contin-

ue[d] to be, faced with a desperate need for housing, especially of decent living accommodations economically suitable for low and moderate income families." *Mount Laurel I, supra,* 67 *N.J.* at 158, 336 *A.*2d 713 (footnote omitted). Despite the documented lack of acceptable accommodations for those most in need, "the only kinds of housing realistically permitted in most places ... [consisted of] relatively high-priced, single-family detached dwellings on sizeable lots and, in some municipalities, expensive apartments." *Id.* at 159, 336 *A.*2d 713. Although the plaintiffs in that case represented poor minorities who claimed that Mount Laurel's land use regulations unconstitutionally barred them from living in the township due to their limited income and resources, we recognized at the outset that "the issue ... [was] not confined to Mount Laurel." *Id.* at 160, 336 *A.*2d 713. We said then:

> The same question arises with respect to any number of other municipalities of sizeable land area outside the central cities and older built-up suburbs of our North and South Jersey metropolitan areas (and surrounding some of the smaller cities outside those areas as well) which, like Mount Laurel, have substantially shed rural characteristics and have undergone great population increase since World War II, or are now in the process of doing so, but still are not completely developed and remain in the path of inevitable future residential, commercial and industrial demand and growth.
>
> [*Ibid.*]

Those words sound prophetic when, in hindsight, we observe the enormous growth that has taken place in the intervening years. U.S. Census Bureau, *Historical Census of Housing Tables—Units in Structure,* at http://www.census.gov/hhes/www/housing/census/historic/units.html (last revised Dec. 15, 2000). Yet, then and now, some municipalities have found that it is in their best "fiscal" interest to exclude low and moderate income persons from their towns. *Mount Laurel I, supra,* 67 *N.J.* at 160, 336 *A.*2d 713. Mount Laurel candidly admitted that "its land use regulation was intended to result and has resulted in economic discrimination and exclusion of substantial segments of the area population...." *Id.* at 160–61, 336 *A.*2d 713. We held then, and reaffirm now, that a municipality may not

> validly, by a system of land use regulation, make it physically and economically impossible to provide low and moderate income housing in the municipality for the

various categories of persons who need and want it and thereby ... exclude such people from living within its confines because of the limited extent of their income and resources.

[*Id.* at 173, 336 *A.2d* 713.]

That holding was grounded in the "state constitutional requirements of substantive due process and equal protection of the laws," implicit in the power to regulate land use for the general welfare. *Id.* at 174–75, 336 *A.2d* 713 (citing *N.J. Const.* art. I, ¶ 1); *see N.J. Const.* art. IV, § 6, ¶ 2; *see also Mount Laurel II, supra,* 92 *N.J.* at 208, 456 *A.2d* 390 (stating that constitutional power to pass land use regulations, "delegated to the municipalities subject to legislation, is but one portion of the police power [that] must be exercised for the general welfare").

 ■ *Mount Laurel I* thus established the contours of municipalities' constitutional obligation to provide a realistic opportunity for the development of low and moderate income housing. But, as we said in that case, "[c]ourts do not build housing nor do municipalities"—builders, private associations, and special governmental agencies do. *Mount Laurel I, supra,* 67 *N.J.* at 192, 336 *A.2d* 713. Under *Mount Laurel I* and our subsequent exclusionary zoning cases, a municipality is responsible for promulgating appropriate land use ordinances under which a developer could be expected to construct the municipality's fair share of affordable housing. *Ibid.* In *Madison, supra,* 72 *N.J.* at 549–51, 371 *A.2d* 1192, however, the Court created a judicial remedy for the enforcement of the *Mount Laurel* doctrine known generally as the builder's remedy. The builder's remedy was designed as an "incentive for the institution of socially beneficial but costly litigation ... [in order to] get[ ] on with the provision of needed housing for at least some portion of the moderate income elements of the population." *Id.* at 550–51, 371 *A.2d* 1192. Without the inducement of such a remedy there was little reason for a private developer to challenge a municipality's zoning ordinances.

We also recognized in *Mount Laurel I, supra,* and *Mount Laurel II, supra,* that municipal zoning ordinances have a substantial impact beyond a municipality's borders implicating the

general welfare "of those residing outside of the municipality but within the region that contributes to the housing demand within the municipality." 67 *N.J.* at 177, 336 *A.*2d 713; 92 *N.J.* at 208, 456 *A.*2d 390. For that reason, we determined in *Mount Laurel I* that a "developing" municipality has a presumptive constitutional obligation affirmatively to afford "a realistic opportunity for the construction of its fair share of the present and prospective regional need for low and moderate income housing." *Mount Laurel II, supra,* 92 *N.J.* at 204–05, 456 *A.*2d 390 (citing *Mount Laurel I, supra,* 67 *N.J.* at 174, 336 *A.*2d 713). At that time, the Court chose to limit its holding to a general notion of developing communities—land areas, outside of central cities and older suburbs, that are in the path of anticipated growth—because there was no "official guidance . . . as to the state's plans for its own future, its own determination of where development should occur and where it should not, and what kind of development. . . ." *Id.* at 224–25, 456 *A.*2d 390. Yet, as we observed in *Mount Laurel II,* the concept was vague, at best, and endangered "prime agricultural land, open spaces, and areas of scenic beauty" in towns that fit within the category of a developing community but that "should *not* yield to 'inevitable future residential, commercial and industrial demand and growth.'" *Id.* at 224, 336 *A.*2d 713 (emphasis in original).

When, in 1980, the Legislature enacted the State Development Guide Plan (SDGP or Plan), "provid[ing] a statewide blueprint for future development," *id.* at 225, 336 *A.*2d 713, we embraced its use in exclusionary zoning cases. "[T]he SDGP discussed a variety of factors related to New Jersey's growth and development, including population distribution, natural resources, infrastructure, and the economy." *Van Dalen, supra,* 120 *N.J.* at 241, 576 *A.*2d 819 (citing *Mount Laurel II, supra,* 92 *N.J.* at 225, 456 *A.*2d 390). The maps developed as part of the Plan provided a framework for decision-making "[b]y clearly setting forth the state's policy as to where growth should be encouraged and discouraged." *Mount Laurel II, supra,* 92 *N.J.* at 226, 456 *A.*2d 390. Accordingly, we held that the *Mount Laurel* mandate should apply essentially in

the areas marked for "growth" by the SDGP. *Id.* at 227, 456 *A.2d* 390. "We observed that the SDGP promoted sound statewide planning because it 'ensure[d] that the imposition of fair share obligations will coincide with the State's regional planning goals and objectives.'" *Van Dalen, supra,* 120 *N.J.* at 242, 576 *A.2d* 819 (quoting *Mount Laurel II, supra,* 92 *N.J.* at 225, 456 *A.2d* 390).

In respect of determining a municipality's fair share, and in the absence of legislative direction on this issue, *Mount Laurel II* established new procedures for the handling of exclusionary zoning litigation in the courts. We understood at that time that our failure to require the designation of a "region, its [present and prospective] need, and the fair share of the municipality" in each case had weakened the *Mount Laurel* mandate. *Mount Laurel II, supra,* 92 *N.J.* at 251, 456 *A.2d* 390. Consequently, we restricted those cases to three judges, each to be responsible for matters arising in his or her region of the State, with the expectation "that after several cases ha[d] been tried before each judge, a regional pattern for the area for which he or she is responsible [would] emerge." *Id.* at 254, 456 *A.2d* 390. We believed that the method for calculating a municipality's fair share would be consistent within the region,[13] and that "[u]ltimately a regional pattern for the entire state [would] be established." *Ibid.* In rejecting our earlier approach, we stated: "What is required is the precision of a specific area and specific numbers. They are required not because we think scientific accuracy is possible, but because we believe the requirement is most likely to achieve the goals of *Mount Laurel.*" *Id.* at 257, 456 *A.2d* 390.

In *Mount Laurel II* we also provided guidance to municipalities regarding what it means to create a "realistic opportunity" for low and moderate income housing. We called for municipalities, "at

---

[13] "Region" had been earlier defined in *Madison, supra,* 72 *N.J.* at 543, 371 *A.2d* 1192, as "that general area which constitutes, more or less, the housing market area of which the subject municipality is a part, and from which the prospective population of the municipality would substantially be drawn, in the absence of exclusionary zoning."

the very least, [to] remove all municipally created barriers to the construction of their fair share of lower income housing." *Id.* at 258–59, 456 *A.*2d 390. But, because merely removing barriers to the construction of low income housing might not be sufficient to bring about that housing, we required affirmative measures "to make the opportunity real." *Id.* at 261, 456 *A.*2d 390. To induce builders to provide affordable housing we suggested "(1) encouraging or requiring the use of available state or federal housing subsidies, and (2) providing incentives for or requiring private developers to set aside a portion of their development for lower income housing." *Id.* at 262, 456 *A.*2d 390.

Our strong preference for legislative action enforcing the constitutional mandate could not have been more clearly stated than in *Mount Laurel II,* wherein we said that

> a brief reminder of the judicial role in this sensitive area is appropriate, since powerful reasons suggest, and we agree, that the matter is better left to the Legislature. We act first and foremost because the Constitution of our State requires protection of the interests involved and because the Legislature has not protected them.
>
> [*Id.* at 212, 456 *A.*2d 390.]

As discussed earlier, *supra* at 513, 803 *A.*2d at 59, the Legislature responded in July 1985 by enacting the FHA. Under that statute COAH was charged with, among other things, determining State housing regions, *N.J.S.A.* 52:27D–307a, estimating the State and regional present and prospective need for low and moderate income housing, *id.* at –307b, and adopting criteria and guidelines for a "[m]unicipal determination of its present and prospective fair share of [the region's] housing need." *Id.* at –307c(1).

COAH's review and mediation process is considered by the Legislature to be the preferred method for resolution of *Mount Laurel* disputes. *Id.* at –303. When a *Mount Laurel* challenge is filed in the Superior Court, the plaintiff must also "file a notice to request review and mediation with" COAH. *Id.* at –316b. If the municipality submitted a housing element[14] and fair share plan to

---

14 COAH defines "housing element" as "that portion of a municipality's master plan consisting of reports, statements, proposals, maps, diagrams and text

COAH before the litigation commenced then the plaintiff must exhaust "review and mediation ... before being entitled to a trial on [the] complaint." *Ibid.*; id. at 309b.

Municipalities not faced with a *Mount Laurel* challenge may seek COAH review of their zoning and affordable housing regulations, *id.* at –314, in order to receive a degree of protection from a future challenge. *See id.* at –317a. A municipality may voluntarily seek substantive certification from COAH, *id.* at –313, after consenting to COAH's jurisdiction by submitting a resolution of participation, a housing element, and a proposed fair share housing ordinance implementing the housing element. *N.J.S.A.* 52:27D–309. After review, if COAH finds that the municipality's housing element provides a realistic opportunity for the development of affordable housing units equal to its fair share obligation, substantive certification is granted, *id.* at –314, thereby establishing a presumption of validity for a ten-year period that may be overcome in subsequent litigation only by clear and convincing evidence. *See id.* at –317a; *id.* at –313a. A municipality may attempt to meet its affordable housing obligation by any method designed to achieve that end, but must at least consider nine specific techniques, including "rezoning for [higher] densities necessary to assure the economic viability of any inclusionary developments." *Id.* at –311a(1). Further, a municipality may, through a Regional Contribution Agreement, "propose the transfer of up to 50% of its fair share to another municipality within its housing region." *Id.* at –312a.

Both the FHA and COAH's regulations address the necessary components of a municipal housing element. At a minimum, it must contain detailed information in respect of present housing inventory, a ten-year projection of the anticipated housing stock, and an analysis of the demographic and employment characteris-

---

designed to meet the municipality's fair share of its region's present and prospective housing needs, particularly with regard to low and moderate income housing...." *N.J.A.C.* 5:93–1.3.

tics of the municipality. *Id.* at –310a to –310d; *N.J.A.C.* 5:93–5.1(b)1 to –5.1(b)4. When a municipality's housing element purports to create "new low and moderate income units within [its] borders by sponsoring their construction ... or by zoning for inclusionary development," *id.* at –5.3(a), or if the municipality has included in its housing element a "municipally sponsored [affordable housing] construction [and gut rehabilitation] program," additional and substantial data must be submitted to COAH. *Id.* at –5.5(a). If the housing element contains inclusionary zoning, each site must be described, existing environmental constraints must be identified, and details regarding available infrastructure must be supplied. *Id.* at –5.3(c)1 to –5.3(c)3. The municipality also must furnish data for each site in respect of "the total number of housing units; the gross and net density of the proposed development; the total number of low and moderate income units; and the number of low and moderate income units that will be for sale and for rent." *Id.* at –5.3(c)4. Similarly, if a municipality has included in its plan a municipally sponsored affordable housing construction and rehabilitation program, it must provide site-specific information, such as documentation "that there is municipal control of the site(s); an administrative mechanism to construct the proposed housing; a funding plan and evidence of adequate funding capacity; and timetables for construction of the units." *Id.* at –5.5(a).

COAH's review process is extensive and probing. By way of example, COAH's consideration of a municipality's plan to zone for inclusionary development covers

> the existing densities surrounding the proposed inclusionary site; the need for a density bonus in order to produce low and moderate income housing; whether the site is approvable, available, developable and suitable ...; the site's conformance with the [State Development and Redevelopment Plan] ...; the existence of steep slopes, wetlands and floodplain areas on the site; the present ability of a developer to construct low and moderate income housing at a specific density; the length of time an inclusionary site has been zoned at a specific density and set-aside without being developed; and the number of inclusionary sites that have developed within the municipality at specific densities and set-asides.

> [*Id.* at –5.6(b).]

It is only after that review that COAH makes its determination whether the municipality's housing element provides a realistic opportunity for the development of the requisite number of affordable units.

In upholding the constitutionality of the FHA, we recognized that it "represent[ed] a substantial effort by the other branches of government to vindicate the *Mount Laurel* constitutional obligation." *Hills, supra,* 103 *N.J.* at 21, 510 *A.*2d 621. We stated then that "[t]his kind of response, one that would permit us to withdraw from this field, is what this Court has always wanted and sought." *Id.* at 65, 510 *A.*2d 621. We found that the FHA dealt with the central concerns of our earlier cases, and, specifically, the need for "consistency on a statewide basis of the determination of regional need, fair share, and the adequacy of the municipal measures." *Id.* at 37, 510 *A.*2d 621.

> Instead of varying and potentially inconsistent definitions of total need, regions, regional need, and fair share that can result from the case-by-case determinations of courts involved in isolated litigation, an overall plan for the state is envisioned, with definitions and standards that will have the kind of consistency that can result only when full responsibility and power are given to a single entity.
>
> [*Id.* at 22, 510 *A.*2d 621.]

Further, we believed that municipal acceptance of inclusionary zoning would be strengthened by the designation of COAH as the arbiter of municipalities' fair share obligations because of the "legitimacy and presumed expertise that derives from selection by the Governor and confirmation by the Senate, in accordance with the will of the Legislature." *Ibid.* In furtherance of consistent determinations of regional needs and fair share allocations, we stated that "the judiciary, assuming the statutory plan functions reasonably effectively, will be responsive to the actions of the Council and conform *its* decisions in this field to the Council's various determinations." *Id.* at 37, 510 *A.*2d 621 (emphasis in original).

Those who challenged the FHA expressed their concern that the Act does not mandate participation by municipalities, either to seek substantive certification from COAH or to subject themselves

to COAH's mediation and review process. It was argued that by not requiring participation the FHA allows some municipalities to ignore their *Mount Laurel* obligations and risk the burdens of litigation if they believe that strategy to be in their best interest.

> The argument has as its premises that the Act depends on the voluntary coopera- tion of municipalities, that the lack of an assured builder's remedy will result in a total loss of interest on the part of builders, which in turn will mean that there will be no construction, and, ultimately, that there will never be lower income housing through any device other than a builder's remedy. If true, this attack is substan- tial.
>
> [*Id.* at 43, 510 A.2d 621.]

We rejected that argument because it was based on speculation that the FHA would not achieve its stated goals, speculation that could not trump the presumption of constitutionality. *Ibid.* We held that "before this Act may be declared *un* constitutional [for failing to achieve its goals], the contention that it will *not* work must be close to a certainty." *Ibid.* (emphasis in original). Be- cause municipalities that choose not to participate in the COAH process would be subject to *Mount Laurel* litigation, we believed that they would choose otherwise. *Id.* at 36, 510 A.2d 621. We concluded:

> It can therefore fairly be assumed that most municipalities that have a potentially significant *Mount Laurel* obligation will file their petition for substantive certifica- tion, their housing element, and fair share housing ordinance within a reasonable period of time after the Council's adoption of its criteria and guidelines.
>
> Thus, what appears at first to be simply an option available to municipalities is more realistically a procedure that practically all municipalities with a significant *Mount Laurel* obligation will follow, both to determine and to satisfy their *Mount Laurel* obligation.
>
> [*Ibid.*]

## V

### *The Certified Questions*

We turn now to the issues we have certified:

(1) whether the trial court erred in concluding that the Township's ordinances, regulations, and site factors prevented a realistic opportunity for development of affordable housing;

(2) whether the trial court erred when it considered market demand for particular housing types when it determined that the Township failed to provide a realistic opportunity for development of affordable housing; and

(3) whether the trial court erred in holding that Toll Brothers was entitled to a builder's remedy.

[*West Windsor, supra,* 167 *N.J.* at 599, 772 *A.*2d 914; *West Windsor, supra,* 167 *N.J.* at 600, 772 *A.*2d 914.]

Because the first two issues are closely related, we consider them together.

A. *Whether the Trial Court Erred in Concluding that the Township Failed to Provide a Realistic Opportunity for the Development of Affordable Housing and in Considering Market Demand for Particular Housing Types in Making That Determination*

Our analysis of these issues entails a two-tiered inquiry, each subject to a separate and distinct standard of review. The determination whether market demand should be considered in assessing whether a municipality's zoning ordinances are exclusionary is a question of law that we review *de novo*. *Balsamides v. Protameen Chem., Inc.,* 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999) (stating that "[m]atters of law are subject to a *de novo* review"). We give deference to the trial court's factual findings, *e.g.*, that West Windsor's sewer requirements are cost generative, as such findings should not be disturbed "when supported by adequate, substantial and credible evidence." *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974).

In concluding that West Windsor had not satisfied its 688–unit affordable housing obligation, the trial court considered, among others, eight undeveloped sites that also had been included in West Windsor's original compliance plan and incorporated into the 1985 judgment. See *supra* at 529, 803 *A.*2d at 69 n. 11. The court's calculation of the number of affordable units that those sites could generate differed sharply from the number found in the original plan. Specifically, the eight sites' affordable housing development potential under both the original plan and as found by the trial court is as follows:

| Site | Original Plan Development Potential | Trial Court Development Potential |
|---|---|---|
| 1 & 5A | 120 Units | 100 Units |
| 2 & 8 | 312 Units | 74 Units |
| 5 | 100 Units | 0 Units |
| 6 | 527 Units | 169 Units |
| 7 | 40 Units | 3 Units |
| B | 206 Units | 64 Units |
| **Total** | **1,305 Units** [15] | **410 Units** |

The original compliance "plan remained in effect, essentially unchanged, [from 1985] until late summer 1994." *West Windsor, supra,* 303 *N.J.Super.* at 531, 697 *A.*2d 201. Thus, if the trial court was correct in its findings, then a significant reduction in site development potential had occurred since the time of the original compliance plan.

The Appellate Division summarily affirmed the trial court's decision "substantially for the reasons expressed ... in [its] comprehensive ... opinion." *West Windsor, supra,* 334 *N.J.Super.* at 111, 756 *A.*2d 1074 (internal citation omitted). The focus of our review, therefore, is on the trial court's analytical approach and factual findings. West Windsor does not take issue with the factors considered by the trial court, with the single exception of market demand. We begin, then, by considering that issue.

### 1. *Market Demand*

The trial court found that marketability and market demand were factors to consider when evaluating whether a

---

[15] Subsequent revisions reported by the trial court reduced the number of units for Site 6 (from 527 units to 315 and then to 225) and Site B (from 206 units to 100 units). Even assuming those numbers, the eight sites alone were projected to yield 897 units.

municipality provided a realistic opportunity for the development of affordable housing. *West Windsor, supra*, 303 *N.J.Super.* at 546, 571–73, 697 *A.*2d 201. Further, the court concluded that West Windsor's continued use of multi-family units, despite the strong demand for single-family units, demonstrated that West Windsor's inclusionary housing plan had not created that realistic opportunity and, therefore, violated the *Mount Laurel* mandate. *Id.* at 548, 697 *A.*2d 201 ("If defendant has over-zoned for densities and types of housing for which there is little or no market, it cannot realistically expect development to occur.").

West Windsor claims that the trial court's consideration of market demand led to the erroneous conclusion that the Township's fair share plan failed to reflect adequately the actual and anticipated demand for various types of affordable housing. Defendant believes that the court improperly focused on market demand for detached, single-family homes instead of giving deference to the type of housing unit—multi-family housing—that the Township chose in its plan. Defendant fears that the issue of compliance now will be subject to the highly volatile whims of the market, thereby preventing a municipality from planning residential housing with any degree of certainty.

Of greatest concern to West Windsor is the trial court's requirement that municipalities "provide flexibility and opportunities in the ordinances that would allow for market responsiveness." *Id.* at 572, 697 *A.*2d 201. Defendant insists that that requirement will prevent sound planning and unduly favors developers because "municipalit[ies will] be obligated to zone for every conceivable housing type" to satisfy a developer's vision of market demand. West Windsor also contends that the trial court's analysis of market demand does not follow COAH regulations and therefore violates the principle stated in *Hills* that courts should give deference to COAH. See *Hills, supra*, 103 *N.J.* at 63, 510 *A.*2d 621. Specifically, defendant argues that COAH does not require market analysis as part of the informational submission from municipalities seeking substantive certification and neither should

the Court. COAH, defendant asserts, concentrates more on the realistic development potential of an affordable housing site rather than the actual development of and market demand for that site.

In response, plaintiff claims that a market-based analysis is an essential factor in determining whether a municipality has created a realistic opportunity for inclusionary development. By means of a market analysis it is possible to determine whether different housing types are attractive to buyers and, consequently, whether zoning that permits only less attractive housing serves as a disincentive to development. Plaintiff contends that in West Windsor the demand for multi-family housing is, at best, minimal, and that by relying in large part on zoning for this housing type, West Windsor is effectively ensuring that it will not meet its *Mount Laurel* obligation.

■ We have considered market factors in our prior opinions. The *Mount Laurel* requirement that a municipality provide a realistic opportunity for the development of affordable housing is grounded, in part, on a determination that the sites chosen for development are economically viable. *Mount Laurel II, supra,* 92 *N.J.* at 260–61, 456 *A.*2d 390 (stating that realistic opportunity means that municipalities must "make it *realistically* possible for lower income housing to be built [and] ... cannot depend on the inclination of developers to help the poor") (emphasis in original). In other words, there must be a "likelihood—to the extent economic conditions allow—that the lower income housing will actually be constructed." *Id.* at 221–22, 456 *A.*2d 390.

■ From the beginning, the Court has recognized that market forces play a role in the viability of site development. In *Mount Laurel I* we criticized municipal overzoning for industrial uses. We explained that "[t]he amount of land removed from residential use by allocation to industrial and commercial purposes must be reasonably related to the present and future potential for such purposes." *Mount Laurel I, supra,* 67 *N.J.* at 187, 336 *A.*2d 713. Likewise, residential zoning ordinances passed by a municipality "must be reasonably related to the present and future

potential" for those uses. *Ibid.* In essence, "every ... municipality must, by its land use regulations, presumptively make *realistically possible* an appropriate variety and choice of housing." *Id.* at 174, 336 *A.*2d 713 (emphasis added).

Similarly, in *Madison, supra,* 72 *N.J.* at 510–14, 371 *A.*2d 1192, we considered the impact of market forces on development in assessing a municipality's compliance with *Mount Laurel* mandates. We acknowledged that economic conditions could be such that, without public subsidization or other external incentives, private builders would not be able to construct profitable housing for the State's low and moderate income populations. *Id.* at 510, 371 *A.*2d 1192. With this in mind, we observed:

> To the extent that the builders of housing in a developing municipality like Madison cannot through publicly assisted means or appropriately legislated incentives ... provide the municipality's fair share of the regional need for lower income housing, it is incumbent on the governing body to adjust its zoning regulations so as to render possible and feasible the "least cost" housing, consistent with minimum standards of health and safety, ... and in amounts sufficient to satisfy the deficit in the hypothesized fair share.
>
> [*Id.* at 512, 371 *A.*2d 1192.]

Those same concerns also are evident in the FHA and COAH's regulations. By way of example, *N.J.S.A.* 52:27D–311a instructs municipalities, when developing housing elements, to consider "[r]ezoning for densities necessary to assure the economic viability of any inclusionary developments." Although COAH regulations do not directly deal with market demand, they rely on evaluations of the marketplace for decision-making. Indeed, various COAH regulations suggest that COAH views market demand to be an important factor in the determination whether a municipality has created a realistic opportunity for the construction of affordable housing. *N.J.A.C.* 5:93–3.5(a) states, in pertinent part:

> Where land has been zoned for low and moderate income housing, the Council shall review sites for suitability and determine if the previously zoned sites present a realistic opportunity for low and moderate income housing before granting a reduction. In its review, the Council shall include but not be limited to a consideration of ... the likelihood of the current zoning to result in the creation of low and moderate income housing....

*N.J.A.C.* 5:93–5.6(b) provides that COAH's review of municipal inclusionary zoning shall include an inquiry into "the present ability of a developer to construct low and moderate income housing at a specific density." COAH explains that *N.J.A.C.* 5:93–5.6 "recognizes that housing markets change and by permitting some zoning at higher densities land will be available to accommodate changes in housing demand." 25 *N.J.R.* 5787 (Dec. 20, 1993). In a response to comments on proposed *N.J.A.C.* 5:93–5.6(b), COAH again discusses market demand:

> [*N.J.A.C.* 5:93–5.6(b) ] establishes criteria that should be considered by the municipality and will be considered by [COAH] in determining the appropriate zoning for a specific site. *The factors to be considered include land use planning considerations and a consideration of the current market.* After consideration of these factors, [COAH] may require that a substantial percentage of inclusionary sites be zoned to allow market units within an inclusionary development to be constructed as single-family detached units.
>
> [26 *N.J.R.* 2304 (June 6, 1994), *quoted in West Windsor, supra,* 303 *N.J.Super.* at 547, 697 *A.*2d 201 (emphasis added by trial court).]

Our case law, the FHA, and COAH all recognize that the realistic opportunity evaluation cannot be made in a theoretical vacuum. Zoning for affordable housing that cannot or will not be built by private developers does not satisfy a municipality's *Mount Laurel* obligation. To state the obvious, developers are motivated by profit, and there is likely no greater area of concern for a developer than the marketability of its project. The colloquial phrase "if you build it, they will come" does not translate well to the building of homes. The realities of our market system must be a critical factor in the application of *Mount Laurel* mandates.

 We hold that the trial court properly considered market demand in its analysis. We agree with the court's observation that when a municipality zones many of its inclusionary sites with "a particular type of housing [that], as a matter of fact, controls only a minute fraction of the market, ... there can be little doubt the opportunity to construct affordable housing is more illusory than real." *West Windsor, supra,* 303 *N.J.Super.* at 545, 697 *A.*2d 201.

Because West Windsor's zoning ordinances relied almost entirely on multi-family housing "as the vehicle for development of inclusionary projects," *id.* at 554, 697 *A.*2d 201, the trial court focused on the demand for that housing type. The court acknowledged that single-family homes were permitted on the inclusionary sites, but only if "located in a specialty zone, or . . . [in the form of] a novel product, *e.g.*, zero lot-line homes." *Ibid.* Those restrictions made significant development of multi-family homes unlikely. After carefully evaluating the demographic data, building permit statistics, zoning of vacant unapproved land, vacancy rates of existing units, and absorption rates of units coming onto the market, *id.* at 566, 697 *A.*2d 201, the court determined that West Windsor's "over-reliance on multi-family housing as the method of producing inclusionary housing has had only limited success in the past and has questionable viability in the future." *Id.* at 571–72, 697 *A.*2d 201. The court found that even though market demand might exist to support the construction of multi-family housing on an individual site, it would be "wholly unrealistic" to assume that at least nine such sites also would be developed. In sum, the limited demand for multi-family housing provided "little or no incentive" for the owners of inclusionary sites to commence development. *Id.* at 545–46, 697 *A.*2d 201.

West Windsor has not adequately explained why it continues to emphasize multi-family housing units, for which market demand is so low, when the market for detached, single-family units is so high. The record informs us that there has been significant construction of detached, single-family units in West Windsor during the period from 1982 to 1992, suggesting that that type of dwelling is responsive to the housing market. We find persuasive the arguments presented by plaintiff and various *amici* that the effect of including substantial numbers of multi-family units in West Windsor's plan is to prevent the development of affordable housing in the Township. That said, we acknowledge that housing markets are dynamic and subject to fluctuation. It makes sense, as various *amici* suggest, to prepare "zoning plan[s that] take[ ] [into account] a longer view of demand patterns." Certainly,

municipal planners should be able to anticipate some level of volatility, and take that into account in developing appropriate land use plans. We emphasize in this regard that the use of market demand is but a factor in the court's evaluation and not an end unto itself.

Nonetheless, zoning ordinances that rely on housing units for which there is little demand to fulfill *Mount Laurel* obligations do not provide a realistic opportunity for the development of affordable housing. In this case, there was substantial evidence to support the trial court's holding that market demand for multi-family housing would not provide that opportunity.

### 2. *Housing Yield*

For similar reasons, we find unconvincing West Windsor's argument that it was error for the trial court to disregard certain COAH regulations when projecting the affordable housing unit yield for each property. The Township claims that the court did not follow the approach outlined in *N.J.A.C.* 5:93–3.5(b), which provides:

> For previously certified sites that remain undeveloped, a municipality may propose an alternative zoning density and set aside as the result of a developer agreement. The Council shall certify each form of zoning and calculate the higher yield in addressing the fair share obligation. If the alternative zoning is exercised and there are unmet units, the Council shall not require the municipality to zone additional sites unless there are compelling reasons. Unmet units shall be addressed in the Council's third fair share cycle.

West Windsor asserts that the trial court was required to follow *N.J.A.C.* 5:93–3.5(b) when evaluating the eight undeveloped sites from the original compliance plan because those sites were zoned for both high density (mostly multi-family) and low density (mostly single-family) housing. Defendant argues that the court should have accepted the Special Master's high-yield calculation that projected the development of 765 affordable units, seventy-seven more than West Windsor's unmet obligation.

By its very terms *N.J.A.C.* 5:93–3.5(b) is not applicable here, as that regulation applies only when a municipality and a developer

of a previously certified site have mutually agreed to alter the permitted zoning density. More important, West Windsor's interpretation would render meaningless various other COAH regulations that call for an extensive and detailed review of inclusionary sites when evaluating a municipal plan. *See, e.g., N.J.A.C.* 5:93-5.6(b) (delineating multiple areas of COAH review in evaluation of sites zoned for affordable housing).[16]

The history of this case further highlights the problem with West Windsor's position. The Toll Brothers site was part of the original compliance plan and was zoned to permit both high and low density housing. The plan was incorporated into the 1985 judgment that expired in 1991. Under West Windsor's proffered interpretation of *N.J.A.C.* 5:93-3(b), when considering Toll Brothers' challenge in 1993, the trial court would have had to adopt the high yield projection for that site despite a demonstrated lack of demand for multi-family housing apparent in 1993. Indeed, since 1985 there have been significant developments that affect yield for many of the sites in the original plan. For example, the Freshwater Wetlands Protection Act, *N.J.S.A.* 13:9B-1 to -30, was enacted on July 1, 1987, effective July 1, 1988, several years after West Windsor's plan was incorporated into the 1985 judgment. To fail to evaluate a site's potential to deliver affordable housing in light of current realities would be contrary to the dictates of this Court's *Mount Laurel* case law.

### 3. Sewer Policies

In reaching its conclusion that West Windsor's sewer construction and financing requirements were unduly cost-genera-

---

[16] West Windsor argues that *N.J.A.C.* 5:93-5.6 must be read in conjunction with *N.J.A.C.* 5:93-4.2, which states, in relevant part: "[A] municipality that received an adjustment due to lack of vacant land in addressing its 1987-1993 need obligation shall be presumed to have addressed its [realistic development potential], provided [it] continues to implement the terms of its previous substantive certification." Again, West Windsor's situation does not fit the specific language of the regulation.

tive, and thus served as a disincentive to development, the trial court discussed the difficulties facing the six inclusionary site developers that were required to construct an oversized and expensive gravity-fed system. Toll Brothers presented credible testimony that it would incur front-end costs of over $1.8 million, including significant acquisition costs, that would effectively deter development of its site. The trial court rejected as "conjecture" West Windsor's assertion that through "sequential development" the inclusionary sites could connect to an existing line at a reasonable cost, and dismissed as "not credible" testimony offered by defendant that the inclusionary sites could, if necessary, qualify for an exemption from certain sewer requirements. The court determined that West Windsor's sewer policies presented a "significant impediment" to the potential development of affordable housing and we agree.

West Windsor argues that the substantial amount of housing constructed in the late 1990s belies a finding that its sewer policies have deterred development and asserts that both before and after the trial court decision, the West Windsor Planning Board approved affordable housing development without any alterations to its sewer policy. However, the factual predicate for those claims lies outside of the record and cannot provide a basis for a finding of error in the trial court decision.[17]

### 4. *Summary*

In its assessment of West Windsor's realistic development potential, the trial court conducted a searching and detailed site-specific inquiry that considered the effects of market demand, sewer policies, environmental constraints, and assemblage. The court examined various experts' reports and conducted a bench

---

[17] West Windsor claims that it was improperly denied permission to supplement the record after the conclusion of the trial with evidence of inclusionary site development activity. The trial court appropriately refused to allow supplementation of the record so late in the proceedings. *West Windsor, supra,* 303 *N.J.Super.* at 530 n. 2, 697 *A.2d* 201 ("At some point the record must close.").

trial that began on September 28, 1994, and ended on March 29, 1995. *West Windsor, supra,* 303 *N.J.Super.* at 530, 697 *A.*2d 201. When the proceedings were completed, the court concluded that West Windsor had not met its 688–unit obligation. That conclusion is supported by the record.

## B. *Whether The Trial Court Erred in Holding that Toll Brothers is Entitled to a Builder's Remedy*

The trial court found that Toll Brothers was entitled to a builder's remedy, concluding that "[t]here is no question that plaintiff-developer Toll Brothers has succeeded in this *Mount Laurel* litigation, and has proposed to develop its land in such a way as to produce a setaside of at least fifteen percent affordable units." *Id.* at 575, 697 *A.*2d 201. The specific details of the remedy were to be resolved after the compliance trial. *Ibid.*

The Appellate Division affirmed substantially for the reasons expressed by the trial court. *West Windsor, supra,* 334 *N.J.Super.* at 111, 756 *A.*2d 1074. The panel held that Toll Brothers met the three requirements for a builder's remedy—"(1) it succeed[ed] in *Mount Laurel* litigation, (2) it propose[d] a project with a substantial amount of affordable housing, and (3) [its] site is suitable, *i.e.,* the municipality fail[ed] to meet its burden of proving that the site is environmentally constrained or [that] construction of the project would represent bad planning." After reviewing the record, the appellate court also rejected West Windsor's argument that Toll Brothers did not act in good faith and, therefore, was not entitled to a builder's remedy. The court cited Toll Brothers' continued dialogue with the Planning Board and its efforts to settle the case.

West Windsor asserts that Toll Brothers failed to satisfy the requirements of *Mount Laurel II* and therefore is not entitled to a builder's remedy. The Township claims that Toll Brothers (1) did not first seek approval for its development from the Township, thereby denying it the opportunity to hear the application; (2) should have been found unsuccessful at trial in challenging the

Township's zoning ordinances; and (3) proposed a development that was not consonant with sound planning and did not provide a substantial number of affordable housing units.

Toll Brothers points to its success at trial in proving West Windsor's non-compliance with the Township's affordable housing obligations. Plaintiff cites as evidence of that success the numerous zoning amendments adopted by West Windsor during and after the commencement of this litigation. According to plaintiff, up to seventy percent of the fair share plan ultimately approved by the court was due to its lawsuit. In addition, plaintiff points to its success at trial in proving its claims regarding market demand, West Windsor's sewer policy, environmental limitations, and lot assemblage.

The courts below properly held that Toll Brothers satisfied the *Mount Laurel II* requirements for the grant of a builder's remedy. West Windsor has not established that Toll Brothers acted in bad faith. Both prior to commencing litigation and throughout the summer and fall of 1993, Toll Brothers communicated with the Planning Board, cautioning that zoning ordinances would have to be amended to implement its project and expressing its willingness to settle. Under the zoning in place at the time, Toll Brothers' plan necessarily would require variances. As the Appellate Division observed, the Toll Brothers site was not a good candidate for variances because of the "size of the property, its importance in the Township's compliance plan and the number of variances needed to build conventional single-family dwellings...." In those circumstances, it cannot be said that Toll Brothers acted in bad faith by not applying to the Planning Board.

We find that Toll Brothers succeeded at trial. West Windsor's claim that it was already compliant and had instituted amendments to its fair share plan at the time Toll Brothers initiated its lawsuit ignores the critical point—it was Toll Brothers that served as the catalyst for change and that successfully demonstrated West Windsor's *non*-compliance with its constitutional obligation. We also find that the Appellate Division properly rejected West

Windsor's assertions that the Toll Brothers development does not accord with sound land use planning and does not provide a substantial number of affordable dwelling units. Indeed, Toll Brothers' development does not differ from development previously permitted except that a portion of the site will contain "marketable" detached single-family houses rather than "unmarketable" zero lot-line houses. In any case, the Toll Brothers development will produce affordable housing that, with a rental bonus, will satisfy 290 units of West Windsor's 688-unit obligation. Although as a general matter a twenty percent set-aside has been considered adequate, the trial court reasonably determined in this case that the fifteen percent set-aside was sufficient.[18]

West Windsor has not demonstrated that the granting of a builder's remedy was erroneous. That conclusion notwithstanding, we note and address arguments raised by certain *amici* that urge the Court either to curtail or to eliminate the builder's remedy. Those *amici* claim that the builder's remedy contributes to suburban sprawl and that developers use the remedy as a weapon against municipalities.

From the outset, the Court has been cognizant of the controversy engendered by the builder's remedy. *Mount Laurel II, supra,* 92 *N.J.* at 279, 456 *A.*2d 390 (stating that "[b]uilder's remedies have been one of many controversial aspects of the *Mount Laurel* doctrine"). Anticipating that controversy, we endorsed the builder's remedy after much deliberation and with a great deal of concern and caution. In *Mount Laurel I,* we explained the origin and scope of municipalities' constitutional obligation, but did not

---

[18] Toll Brothers points out that, with rental units, developers must provide a continuing fluctuating subsidy for up to thirty years. *See N.J.A.C.* 5:93–9.2(e); *see also N.J.A.C.* 5:93–5.6(b)2 (permitting set-asides of fifteen percent for inclusionary developments containing single-family, detached units). Yet, our dissenting colleague would have the trial court reconsider the fifteen percent set-aside. *Post* at 567, 576–77, 803 *A.*2d at 92, 98–99. We observe in this regard that the trial court approved an overall compliance plan that included a *total* number of low and moderate income units sufficient to meet West Windsor's fair share obligations.

specify how that obligation would be enforced. Instead, we decided that, at least initially, it was "not appropriate . . . to deal with the matter of the further extent of judicial power in the field or to exercise any such power." *Mount Laurel I, supra,* 67 *N.J.* at 192, 336 *A.*2d 713. That approach was, in part, rooted in our understanding that developers (both private and public) and governmental agencies construct housing, not courts or municipalities. *Ibid.* We held that a municipality could meet its affordable housing obligation by providing conditions conducive to development through its zoning ordinances. *Ibid.* It was our hope and expectation that municipalities would work to achieve compliance, and that the legislative and executive branches would take an active role in implementation of the *Mount Laurel* doctrine.

In the two-year period that followed, however, the Legislature did not act, nor was there widespread municipal compliance. We found it necessary to authorize a mechanism to compensate a builder who successfully demonstrated that a municipality was not meeting its affordable housing obligation. *Madison, supra,* 72 *N.J.* at 548–51, 371 *A.*2d 1192. On that successful demonstration, the municipality would be required to revise its plan so as to provide a realistic opportunity for the development of low and moderate income housing. The purpose of the remedy, then, was to accomplish what a municipality might otherwise have been unable or unwilling to do itself; the incentive for instituting such litigation would be the opportunity to develop an inclusionary zoning site at a reasonable profit. Without that opportunity, builders instituting *Mount Laurel* challenges would achieve but a "pyrrhic victory." *Id.* at 550, 371 *A.*2d 1192.

Later, in *Mount Laurel II,* we determined that "[b]uilder's remedies [would] be afforded to plaintiffs in *Mount Laurel* litigation where appropriate, on a case-by-case basis." 92 *N.J.* at 218, 456 *A.*2d 390. We held that

where a developer succeeds in *Mount Laurel* litigation and proposes a project providing a substantial amount of lower income housing, a builder's remedy should be granted unless the municipality establishes that because of environmental or

other substantial planning concerns, the plaintiff's proposed project is clearly contrary to sound land use planning.

[*Id.* at 279–80, 456 *A.*2d 390 (footnote omitted).]

Concerned about "sound land use planning," we stressed that when formulating a specific builder's remedy, the trial courts should "make as much use as they can of the planning board's expertise and experience so that the proposed project is suitable for the municipality." *Id.* at 280, 456 *A.*2d 390. We further advised trial courts to take care to "guard the public interest" by ensuring that plaintiff-developers do not "abuse the *Mount Laurel* doctrine." *Id.* at 281, 456 *A.*2d 390.

When enacting the FHA, the Legislature provided "various alternatives to the use of the builder's remedy as a method of achieving fair share housing," including the COAH mediation and review process, which was "the State's preference for the resolution of existing and future disputes involving exclusionary zoning...." *N.J.S.A.* 52:27D–303. In *Hills, supra,* 103 *N.J.* at 52, 510 *A.*2d 621, we expressed our support for COAH-resolution of *Mount Laurel* disputes, anticipating that the COAH process might more effectively foster the construction of affordable housing. As previously noted, *supra* at 548, 803 *A.*2d at 81, we assumed that "most municipalities that have a potentially significant *Mount Laurel* obligation will file their petition for substantive certification...." *Hills, supra,* 103 *N.J.* at 36, 510 *A.*2d 621. Today we know that there has not been universal municipal participation in the COAH process. As of June 30, 2001, 271 of 521 municipalities, or roughly fifty-two percent, have filed with COAH.[19] That statistic and this case demonstrate a continued need for the builder's remedy.

---

[19] COAH reports that of the 566 municipalities in the State, forty-five are considered "urban aid communities [that] do not have a new construction component[,] ... are not likely to be sued for exclusionary zoning and, as a rule, do not petition for substantive certification." ·COAH, *COAH's 2001 Annual Report: COAH Options* 4 (June 30, 2001) (COAH Report).

The dissent has pointed out that during this period a substantial amount of commercial and residential development has occurred throughout New Jersey, only a fraction of which has been affordable housing. *Post* at 568–69, 803 *A.*2d at 93. Indeed, the perception that builder's remedies are routinely granted is simply not correct. A survey of builder's remedy decisions provided by certain *amici* reveals that in thirteen Superior Court cases, eight builder's remedies were granted and five were rejected. At the same time, out of nine builder's remedy cases before COAH, only one was approved.[20]

Whether through COAH or as the result of litigation, since 1980 more than 28,855 affordable housing units have been constructed. *See* COAH Report at 4. That amount of housing is not likely to have a large impact on the municipal landscape. In contrast, as the dissent observes, *post* at 568, 803 *A.*2d at 93, there has been significant development state-wide of market rate residential housing (more than 450,000 units since 1983). David N. Kinsey, *Reaffirm Mount Laurel, N.J.L.J.*, Aug. 13, 2001, at 619. In West Windsor alone over 3,000 expensive single-family homes have been constructed on large lots during the 1980s and early 1990s when "only 139 low and moderate income units" were built. *West Windsor, supra,* 303 *N.J.Super.* at 531, 697 *A.*2d 201.

In this vein, it is important to point out what we are *not* deciding today. As mentioned earlier, *supra* at 539, 803 *A.*2d at 75, the *amici* participants in this appeal have raised a myriad of issues that were not raised below by the parties. Although our dissenting colleague considers "it appropriate to address collateral concerns about the builders' remedy," *post* at 567, 803 *A.*2d at 93, we believe the record to be inadequate for review and disposition of those issues. By way of example, the dissent would have us remand this matter to the trial court to consider requiring Toll

---

[20] We recognize that those numbers do not reflect builder's remedy lawsuits that are settled prior to or during litigation. Even so, the information presented to us suggests that there have not been many builder's remedy approvals.

Brothers to include "housing units affordable to households with incomes below forty percent of median income." Post at 583, 803 A.2d at 102. Aside from any concerns we might have about delaying the construction of low and moderate income housing even further,[21] we do not have enough information in this record to justify a remand now. We do note, however, that in a prior challenge to COAH's affordability standards, which have been applied in this case, the Appellate Division held that the plaintiffs failed to "point[ ] to any data which indicate[d] that COAH's ... standards fail[ed] to properly implement the goals of *Mount Laurel* within the economic limitations imposed by the operation of the private real estate market." *In re Township of Warren,* 247 *N.J.Super.* 146, 182–83, 588 *A.*2d 1227 (App.Div.1991), *cert. denied,* 127 *N.J.* 557, 606 *A.*2d 369 (1992), *rev'd on other grounds,* 132 *N.J.* 1, 622 *A.*2d 1257 (1993). To the extent that data has been developed on this issue in the last ten years, those data would be evaluated best in a separate challenge on a fully developed record.

Nonetheless, we are able on the information presented and available to make certain observations. The State Development and Redevelopment Plan (SDRP or State Plan) "acknowledges 'a moral and legal obligation to provide all [New Jersey] citizens with the opportunity to meet their housing needs at prices they can afford,' and recognizes that a comprehensive housing policy emphasizing the need to lower housing costs and increase opportunities for all income and ethnic groups is critical to the state's economy." New Jersey State Planning Commission, *The New Jersey State Development and Redevelopment Plan* 85 (2001). We are aware of a renewed emphasis on statewide planning initiated by the Governor under a newly constituted State Capital

---

[21] The first *Mount Laurel* litigation in West Windsor was filed in 1984; this action was filed in 1993. The prior owner of the Toll Brothers' site was delayed three-and-one-half-years while the Township held over fifty public hearings. *See supra* at 517–18, 803 *A.*2d at 62. It is now 2002 and the largest inclusionary development in West Windsor has yet to be developed.

Planning Commission, and of the importance of that effort in guiding municipal planning for low and moderate income housing. In this case, the Toll Brothers site lies within the Route One–West Windsor Regional Center identified in the SDRP. *Id.* at 301. The SDRP states that "Centers are the State Plan's preferred vehicle for accommodating growth ... [and that] Center-based development patterns are superior to sprawl." *Id.* at 230. From the perspective of the SDRP, then, the builders' remedy granted by the trial court to Toll Brothers applies to property appropriately zoned to provide for regional housing needs under the State Plan. We anticipate that future planning will provide for low and moderate income housing, taking into account environmental concerns and other sensitive and important issues.

Finally, the dissent has mentioned the Court's remand to the Civil Practice Committee in respect of a minority report entitled *Fee Shifting in Public Interest Litigation. Post* at 580, 803 *A.*2d at 101. Although we fully appreciate the goal of reducing reliance on builders' remedy litigation to advance the development of affordable housing, we express no views on a proposal that will be reviewed and considered through the administrative process.

## VI

### *Conclusion*

West Windsor chose not to submit to COAH's jurisdiction when its period of repose expired after the first round of *Mount Laurel* litigation. See *supra* at 517, 803 *A.*2d at 61. As a result, after Toll Brothers filed this second round litigation in 1993, the matter remained in the Superior Court and was adjudicated there. When a municipality like West Windsor does not avail itself of the COAH processes and protections, that municipality remains vulnerable to a *Mount Laurel* challenge.

If municipalities believe, as the League of Municipalities contends, that the builder's remedy has become a developer's weapon, it is the municipalities that possess the shield of COAH-

afforded protection to ward off builder's remedy litigation. Until practically all municipalities with a significant *Mount Laurel* obligation use the COAH process, however, the builder's remedy remains a necessary mechanism for the enforcement of constitutional values. Experience demonstrates that absent adequate enforcement, the *Mount Laurel* doctrine can deliver little more than a vague and hollow promise that a reasonable opportunity for the development of affordable housing will be provided. This case demonstrates that unfortunate fact.

The judgment of the Appellate Division is affirmed.

STEIN, J., concurring in part and dissenting in part.

I agree with the Court's disposition of the three certified questions, including its determination that Toll Brothers was entitled to a builder's remedy. In my view, however, the specific remedy granted by the lower courts to Toll Brothers was far too generous. It did not sufficiently address the housing needs of low income households, particularly those earning less than forty percent of median income. The remedy granted Toll Brothers also was too generous in requiring that only fifteen percent of the housing units to be built by Toll Brothers be affordable by low and moderate income households. To the extent that those deficiencies in the builder's remedy granted to Toll Brothers are attributable to regulations promulgated by the Council on Affordable Housing (COAH) on which the trial court relied, I would conclude that those regulations, irrespective of their validity, are not applicable to builder's remedy litigation.

This is the first time since our decision in *Hills Development Co. v. Township of Bernards,* 103 *N.J.* 1, 510 *A.*2d 621 (1986), that the Court is presented with a record that implicates the use of the builder's remedy to vindicate the constitutional principles underlying our decision in *Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel,* 92 *N.J.* 158, 456 *A.*2d 390 (1983) (*Mount Laurel II*). Accordingly, I deem it appropriate to address collateral concerns about the builder's remedy advanced by some

of the parties participating as *amicus curiae* in this litigation. Those concerns include COAH's methodology for calculating the regional fair share of affordable housing that in my view misallocates the burden of constructing that housing, with the result that builder's remedy lawsuits too often are filed in communities with slow rates of growth rather than in communities that have planned for and are experiencing rapid development. Another concern is over-reliance on builder's remedy litigation, one remedy for which would be a limited authorization of fee shifting in favor of successful non-profit plaintiffs that file and litigate inclusionary housing suits against non-compliant municipalities.[22]

Before addressing issues that focus on improving the effectiveness of or diminishing reliance on the builder's remedy, an important misconception should be confronted. Some critics of the *Mount Laurel* doctrine and the builder's remedy claim that they are the primary cause of "sprawl," overdevelopment, and the loss of open space throughout the state. Reliable statistics contradict that criticism. Since 1983, when *Mount Laurel II* was decided, approximately 480,000 residential dwelling units have been constructed of which about 26,000 units, or 5.4 percent, constituted units affordable to low and moderate income households. In addition, during the years 1995 to 2000, approximately sixty million square feet of office and retail space has been built throughout the State. David N. Kinsey, *Reaffirm Mount Laurel,* 165 *N.J.L.J.* 619 (Aug. 13, 2001). Those statistics suggest that if overdevelopment has occurred, the source of that overdevelop-

---

[22] Our precedents fully support consideration by the Court, when appropriate, of issues not directly raised by the parties. *See In the Matter of the Registrant C.A.,* 146 *N.J.* 71, 80, 679 *A.2d* 1153 (1996) ("We also address issues, not directly raised in this appeal, that relate to the validity of the Registrant Risk Assessment Scale that the Court *sua sponte* requested the parties and *amici curiae* to address."); *State v. Gerald,* 113 *N.J.* 40, 69, 549 *A.2d* 792 (1988) ("We turn now to a question that has been neither raised nor argued by the parties, but one that nevertheless demands consideration because of its importance to a just resolution of this appeal.").

ment is market-priced housing and commercial construction, not affordable housing.

## I

## A

The *amici* briefs of the Rutgers Environmental Law Clinic and the Fair Share Housing Center argue forcefully that one of the most serious flaws in the implementation of the *Mount Laurel* doctrine, either through the builder's remedy or through COAH's substantive certification process, is that the "affordable housing" units constructed are not affordable by the very poor, particularly those households below forty percent of median income.[23] Amici's argument is persuasive and disturbing.

COAH's affordability regulations *do not require that any housing* constructed in inclusionary developments be affordable by households earning less than forty percent of median income. *N.J.A.C.* 5:92–14.2, entitled "Range of affordability for purchased housing," requires municipalities seeking substantive certification to ensure that the average price of low and moderate income housing units within an inclusionary development be affordable by

---

[23] According to the Fair Housing Act, *N.J.S.A.* 52:27D–304, low income and moderate income housing means housing that will be occupied by low and moderate income families based on the "median gross household income for households of the same size within the housing region in which the housing is located." COAH regulation *N.J.A.C.* 5:43–1.5 explains that the median gross income is established "by geographic region and household size using income figures and family size adjustment methodology published periodically by the ... U.S. Department of Housing and Urban Development [HUD] and approved for use by the Council on Affordable Housing." Based on a January 31, 2002, memorandum from HUD discussing "Estimated Median Family Incomes for FY 2002," the estimated "median family income for the United States for FY 2002 is $54,400." Apparently in reliance on the HUD data, COAH has promulgated regional income limits as of April 3, 2002. The regional income limits vary among twenty-one counties that have been divided into six different regions throughout New Jersey. Based on a two-person household the statewide median income is $57,188 and reflects the average of the median income of the six regions.

households earning 57.5 percent of median income. That regulation also requires the following distribution of prices for every twenty low and moderate income units:

Proposed Pricing Stratification

*Low*

1 at 40 through 42.5 percent
3 at 42.6 through 47.5 percent
6 at 47.6 through 50 percent

### Moderate

1 at 50.1 through 57.5 percent
1 at 57.6 through 64.5 percent
1 at 64.6 through 68.5 percent
1 at 68.6 through 72.5 percent
2 at 72.6 through 77.5 percent
4 at 77.6 through 80 percent

The summary of Public Comments and Agency Responses relating to the adoption of that affordability regulation reveals that COAH believed that it was not "realistic" to require low income housing to be affordable to households earning less than forty percent of median income:

> COMMENT: *N.J.A.C.* 5:92–14.2 pertaining to range of affordability for purchased housing, does not provide sufficient opportunities for low income units.
>
> RESPONSE: The proposed rule is intended to provide affordable housing to the widest possible spectrum of low and moderate income households. However, the rule recognizes the problems low income households have in qualifying for mortgages, raising a downpayment and paying for closing costs. *Due to these difficulties, the Council did not think it was realistic to require purchased housing to be priced so as to be affordable to those households earning less than 40 percent of the median income.* However, it should be noted that the Council has recognized the need of very low income households by requiring a rental housing component of municipalities and by allowing municipalities to accommodate their housing obligations through alternative living arrangements that are a more realistic economic alternative to very low income households.
>
> [18 *N.J.R.* 2443 (emphasis added).]

COAH's affordability regulation will determine the prices of the affordable housing units to be built by Toll Brothers pursuant to the builder's remedy awarded to it. The Law Division's July 30,

1997, Order Establishing Builder's Remedy Standards mandated that "West Windsor's Ordinances relating to controls on Affordable Units shall be amended to conform to the standards set forth in the [COAH regulations]."

COAH's affordability regulation, and the Law Division's assumption that that regulation was binding on it for purposes of establishing the affordability of the low and moderate income housing units to be built by Toll brothers, appear to be inconsistent with a fundamental premise of the *Mount Laurel* doctrine. That premise is that a portion of the housing built pursuant to *Mount Laurel* be affordable by *low* income households. This Court emphasized that principle explicitly in *Mount Laurel II.*

> In determining fair share, the court should decide the proportion between low and moderate income housing unless there are substantial reasons not to do so. The provisions and devices needed to produce moderate income housing may fall short of those needed for lower. *Since there are two fairly distinct lower income housing needs, an effort must be made to meet both.*
>
> The proportion between the two is, inevitably, a matter for expert testimony. It will depend, as does the fair share itself, on a complex mix of factors. We note, without comment, the trial court's use in *Carteret,* for this purpose, of the actual proportion between the low and moderate income population of the county. The point here is that it is an issue that should be addressed in passing on the adequacy of land use regulations (and revisions thereof) *as well as builder's remedies.*
>
> [92 *N.J.* at 256–57, 456 *A.*2d 390 (citation omitted) (emphasis added).]

That *Mount Laurel II* contemplated that affordable housing would include units affordable by low income households is incontestable. Moreover, the Fair Housing Act does not distinguish between the needs of low and moderate income households, nor does it authorize exclusion of households below forty percent of median income. See *N.J.S.A.* 52:27D–304c to 304d (defining "low income housing" as housing affordable by households with gross income equal to 50% or less of median income of same size household within region, and defining "moderate income housing" as housing affordable by households with gross income between 50% and 80% of median income of same size households within region); *N.J.S.A.* 52:27D–310 (requiring municipality's housing element to address municipality's fair share of low and moderate income housing); *N.J.S.A.* 52:27D–311 (addressing techniques for

providing low and moderate income housing); *N.J.S.A.* 52:27D– 314 (conditioning substantive certification by COAH on finding that municipality's fair share plan is consistent with achievement of low and moderate income housing needs of region).

In setting forth the analytical basis for the constitutional obligation imposed by *Mount Laurel II,* Chief Justice Wilentz emphasized that the urban poor were intended to be among the primary beneficiaries of the *Mount Laurel* holding:

> The basis for the constitutional obligation is simple: the State controls the use of land, *all* of the land. In exercising that control it cannot favor rich over poor. It cannot legislatively set aside dilapidated housing in urban ghettos for the poor and decent housing elsewhere for everyone else. The government that controls this land represents everyone. While the State may not have the ability to eliminate poverty, it cannot use that condition as the basis for imposing further disadvantages. And the same applies to the municipality, to which this control over land has been constitutionally delegated.

> The clarity of the constitutional obligation is seen most simply by imagining what this state could be like were this claim never to be recognized and enforced: poor people forever zoned out of substantial areas of the state, not because housing could not be built for them but because they are not wanted; poor people forced to live in urban slums forever not because suburbia, developing rural areas, fully developed residential sections, seashore resorts, and other attractive locations could not accommodate them, but simply because they are not wanted. It is a vision not only at variance with the requirement that the zoning power be used for the general welfare but with all concepts of fundamental fairness and decency that underpin many constitutional obligations.

> [92 *N.J.* at 209–10, 456 *A.*2d 390.]

In the context of the purposes underlying the *Mount Laurel* doctrine, as well as the provisions of the Fair Housing Act cited above, the validity of COAH's regulation that excludes from the range of affordability of low and moderate housing units those households earning less than forty percent of median income is highly questionable. Although we have acknowledged that "[t]his principle of judicial deference to agency action is particularly well-suited to our review of administrative regulations adopted by COAH to implement the Fair Housing Act," we also emphasized that that deference was not intended to "dilute COAH's duty to adopt regulatory methods that are consistent with the statutory

goals." *In re Petition for Substantive Certification Filed by the Township of Warren,* 132 *N.J.* 1, 27–28, 622 *A.2d* 1257 (1993).

However, the validity of COAH's "range of affordability" regulation is not directly or indirectly implicated by this appeal. That regulation applies only to low and moderate income housing units proposed to be constructed by a municipality petitioning COAH for substantive certification pursuant to the Fair Housing Act. However, the Law Division undoubtedly assumed that, in implementing the builder's remedy for Toll Brothers, it should be guided by COAH's range of affordability regulation. In my view that assumption, although understandable, is unwarranted.

The source of the Law Division's assumption that it should follow COAH's regulations in implementing the Toll Brothers builder's remedy is this Court's opinion in *Hills, supra,* 103 *N.J.* 1, 510 *A.2d* 621. In the course of that opinion, we emphasized the desirability of harmonizing judicial decisions involving the *Mount Laurel* doctrine with COAH's regulatory determinations:

> This statutory scheme addresses the main needs delineated in our prior decisions on this matter, namely, the consistency on a statewide basis of the determination of regional need, fair share, and the adequacy of the municipal measures. Furthermore, the decisions and actions by the Council will follow the contours of the SDRP (when completed), explicitly designed for this purpose, among others. Revisions, adjustments, fine tuning—all of the techniques available to an administrative agency—can be implemented on a statewide basis as experience teaches the Council what works and what does not. The risk that discordant development might result if *Mount Laurel* cases continue to be decided by the courts is minimized by the considerations noted above, which lead to the conclusion that most municipalities will use the Council's procedures. Furthermore, the judiciary, assuming the statutory plan functions reasonably effectively, will be responsive to the actions of the Council and conform *its* decisions in this field to the Council's various determinations.
>
> [*Id.* at 37, 510 *A.2d* 621.]

We also stated:

> This Court will do its proper share in this cooperative effort. While the Legislature has left a continuing role under the Act for the judiciary in *Mount Laurel* matters, any such proceedings before a court should conform wherever possible to the decisions, criteria, and guidelines of the Council. We do not believe the Legislature wanted lower income housing opportunities to develop in two different directions at the same time, contrary to sound comprehensive planning. In that connection, courts will, pursuant to section 16b, transfer to the Council any

*Mount Laurel* action hereafter commenced except where the Act clearly calls for retention (such as the petition for a declaratory judgment referred to in Section 13).

[*Id.* at 63, 510 A.2d 621.]

Notwithstanding the clear preference we expressed in *Hills, supra,* that judicially imposed remedies be harmonized with COAH's regulatory determinations, that preference is not unlimited nor should it be extended beyond its logical limits. The principle underlying the use of the builder's remedy is that the profit realized by the successful builder in constructing market-price housing will permit the builder to subsidize the affordable housing units to be constructed. We made that point expressly in *Mount Laurel II:*

The balance of the project will presumably include middle and upper income housing. Economically integrated housing may be better for all concerned in various ways. *Furthermore, the middle and upper income units may be necessary to render the project profitable.* If builder's remedies cannot be profitable, the incentive for builders to enforce *Mount Laurel* is lost.

[92 *N.J.* at 279 n. 37, 456 A.2d 390 (emphasis added).]

Unlike the process of substantive certification in which a municipality submits a housing element for COAH's review, the grant of a builder's remedy by a trial court is a more dynamic and more flexible proceeding. Variables include the total number of market-priced units to be permitted, the percentage of affordable housing units to be required, the price ranges of the affordable housing units, the timetable for construction of both affordable and market-price units, and numerous other factors. Trial courts implementing builder's remedies have at their disposal various mechanisms for encouraging the successful builder-litigant to provide affordable housing for households whose median incomes fall at the lower end of, as well as below, COAH's range of affordability. In view of this Court's specific requirement in *Mount Laurel II* that affordable housing units include units affordable to low income families, including the urban poor, it would be a bitter irony if courts implementing the builder's remedy—a judicially created enforcement mechanism—should fail to assure that a significant number of the affordable housing units are within the

reach of low-income households, including households whose incomes are below forty percent of median income.

We are informed by *amici* that regulations adopted by the Department of Community Affairs under the Balanced Housing Program, *N.J.A.C.* 5:43–1.4(c)(1), and by the Housing and Mortgage Finance Agency that administers the Federal Low Income Housing Tax Credit Qualified Allocation Plan, *N.J.A.C.* 5:80–33.13, do not permit the grant of subsidies under those programs to developers of inclusionary developments that have benefited from zoning created by a density bonus. As inexplicable as those regulatory exclusions may be, they do not exhaust the available funding mechanisms for low income housing. The use of development fees pursuant to municipal ordinances approved by COAH conceivably could provide available funding for such housing. Additional funding sources are cited in the Fair Share Housing Center *amicus* brief. The parties participating in builder's remedy litigation may be familiar with other funding sources. The point is that the COAH regulation on range of affordability, which I consider to be of doubtful validity. even as applied to the substantive certification process, should not be binding on trial courts that implement builder's remedies. Such a limitation on the trial court's discretion is utterly incompatible with the principles underlying *Mount Laurel II*.

## B

A similar analysis is applicable to the trial court's determination that of the 1,165 units to be constructed by Toll Brothers, approximately fifteen percent or 175 units must be affordable to low and moderate income households. The July 30, 1997, order of the Law Division expressly provides as follows: "Toll shall provide a set-aside of fifteen percent (15%) of the total units as rental, family Affordable Units."

That requirement of a fifteen percent set-aside is consistent with the requirements of COAH's regulations pertaining to inclusionary developments, particularly *N.J.A.C.* 5:92–14.4 entitled

"Rental Housing." That regulation provides in part: "Within zones designated for rental inclusionary developments, the Council shall presumptively require a 15 percent maximum set-aside and a minimum gross density of 7.8 units per acre." *N.J.A.C.* 5:92–14.4(c). Other COAH regulations also favor a fifteen percent set-aside. *N.J.A.C.* 5:93–5.6, entitled "Zoning for inclusionary development," provides that COAH generally will favor the construction of single-family detached units as part of an inclusionary site at a "gross density of four units per acre with a 15 percent set-aside."

The COAH preference for a fifteen percent set aside for affordable housing contrasts sharply with this Court's express preference in *Mount Laurel II* for a *minimum* set-aside of twenty percent of affordable housing. In *Mount Laurel II* we held that a developer that succeeds in *Mount Laurel* litigation and "proposes a project providing a substantial amount of lower income housing," ordinarily should be entitled to a builder's remedy. *Mount Laurel II, supra,* 92 *N.J.* at 279, 456 *A.*2d 390. In a footnote the Court elaborated by explaining what constituted a project providing a substantial amount of lower income housing:

> What is "substantial" in a particular case will be for the trial court to decide. The court should consider such factors as the size of the plaintiff's proposed project, *the percentage of the project to be devoted to lower income housing (20 percent appears to us to be a reasonable minimum),* what proportion of the defendant municipality's fair share allocation would be provided by the project, and the extent to which the remaining housing in the project can be categorized as "least cost."

> [92 *N.J.* at 279 n. 37, 456 *A.*2d 390 (emphasis added).]

As was the case with COAH's "range of affordability" regulation, COAH's fifteen percent set aside preference should not, in my view, be binding on trial courts supervising builder's remedy litigation. Because the relief to be afforded in such litigation is intended to provide the maximum number of affordable housing units that are feasible, consistent with the market-rate housing units to be constructed by the successful builder-litigant, a court should not be restricted by the COAH preference for fifteen percent set-asides. Putting to one side the validity of the COAH

regulations, those regulations are intended expressly to apply to municipal petitions for substantive certification. That process, as noted above, is drastically different from the more flexible process implicated in builder's remedy litigation. The same considerations that suggest the irrelevance of COAH's range of affordability regulation to builder's remedy lawsuits apply with equal force to COAH's express preference for only a fifteen percent set-aside for affordable housing units in inclusionary developments.

## C

Another significant issue raised by *amicus* Rutgers Environmental Law Clinic concerns the methodology used by COAH to calculate regional and municipal fair share of low and moderate income housing. The existing COAH formula is substantially patterned on the trial court's opinion in *AMG Realty Co. v. Warren Township*, 207 *N.J.Super.* 388, 504 *A.2d* 692 (Law Div. 1984). We summarized that methodology in *Twp. of Warren*, *supra*, 132 *N.J.* at 17–19, 622 *A.2d* 1257. In its simplest terms, COAH considers four factors in allocating prospective regional need: (a) annual employment change within a municipality as a percentage of regional employment change; (b) employment in a municipality as a percentage of regional employment; (c) municipal land and growth areas as a percentage of growth areas in the region; and (d) municipal aggregate *per capita* income as a percentage of regional *per capita* income. In short, fifty percent of the weight for allocating a municipality's prospective regional need is based on that municipality's proportionate share of the region's employment and the remaining fifty percent is based on the municipality's physical and financial capacity to accommodate affordable housing. Advocates of affordable housing argue that that formula is unnecessarily complex and, more importantly, fails to take into account the growth anticipated to occur in the subject municipality in the ensuing years. Advocates of a "growth share" approach to the calculation of municipal and regional need for affordable housing note that the Fair Housing Act, *N.J.S.A.*

52:27D–310, imposes an obligation on municipalities seeking substantive certification to include detailed information that would inform COAH about the projected growth and development in the municipality. That statutory provision requires the housing element to include, for example, the following: "A projection of the municipality's housing stock, including the probable future construction of low and moderate income housing, for the next ten years, taking into account, but not necessarily limited to, construction permits issued, approvals of applications for development and probable residential development of lands." *N.J.S.A.* 52:27D–310(b).

COAH has not yet promulgated its regional and municipal fair share requirements applicable to the "third round," and the Court is informed that a proposal incorporating the growth share concept has been submitted to COAH for its consideration. In its simplest terms, that proposal contemplates that a municipality's growth share would constitute its proportionate share of actual residential and nonresidential development in the municipality over the next six years. The residential growth share would constitute one-fifth of the total of new residential construction, analogous to the twenty percent set-aside referred to in *Mount Laurel II*. The nonresidential growth share would be calculated by converting actual nonresidential development into affordable units based on a formula that equates one affordable housing unit with a specific number of square feet of nonresidential construction. See John M. Payne, *Remedies for Affordable Housing: From Fair Share to Growth Share,* Land Use Law and Zoning Digest (Jun. 1997 at 3–9).

The obvious virtue of a fair share calculation based on actual growth is that the municipalities best able to accommodate additional affordable housing units would bear the greatest burden of constructing those units, whereas municipalities not contemplating significant growth would bear a reduced burden. The reallocation of municipal fair share that could result from a change in COAH's methodology appropriately could redirect significant portions of

the responsibility for affordable housing to those municipalities in the state experiencing the greatest increase in residential and commercial development.

## D

*Amicus* Rutgers Environmental Law Clinic also asserts that the Court should supplement the *Mount Laurel* doctrine by authorizing an award of counsel fees to nonprofit plaintiffs that institute and prevail in exclusionary housing litigation. *Amicus* observes that although in the early stages of *Mount Laurel* litigation numerous nonprofit entities filed suits and participated in exclusionary housing litigation, the trend in recent years largely has been in the direction of litigation instituted by builders seeking a builder's remedy. *Amicus* notes that the disadvantage of builder's remedy litigation is that affordable housing units resulting from such litigation constitute no more than twenty percent, and more likely fifteen percent, of the total number of units permitted to be constructed by the court. In comparison, in suits instituted by nonprofit plaintiffs all of the housing units constructed would be affordable to low and moderate income households, thereby eliminating the need for the construction of market price units to subsidize the affordable housing units.

Coincidentally, our Court recently considered at its June 11, 2002, administrative conference the report of the Supreme Court Civil Practice Committee that included a proposal entitled "Fee Shifting in Public Litigation." The Court was informed that the majority of the Civil Practice Committee did not favor a fee shifting proposal as a matter of policy. A minority report submitted by members of the subcommittee on Fee Shifting in Public Interest Litigation disagreed with the majority's conclusion. That report noted that plaintiffs who prevail in advancing rights asserted under the United States Constitution often can recover counsel fees, in both state and federal court, pursuant to 42 *U.S.C.* § 1988. The minority report also noted that numerous statutes and court rules authorize fee shifting and that "the omission of state consti-

tutional claims from these fee provisions is incongruous." The proposed fee shifting rule advocated by the minority report would authorize a court, in its discretion, to award reasonable counsel fees and reasonable litigation expenses to a claimant who successfully has asserted a right under the New Jersey Constitution. That counsel fee award, however, would be limited to a reasonable hourly rate not to exceed $150 and compensation for paralegals and support staff not to exceed $50. No enhancement of a fee award would be permitted on the basis of the novelty or complexity of the claim. See 2002 Report of the Supreme Court Civil Practice Committee, 167 *N.J.L.J.* 689 app. D (Feb. 25, 2002).

At its June 11, 2002 conference the Court administratively decided not to accept the majority report of the Civil Practice Committee and to remand the matter to the full committee with instructions to reconsider, refine, and resubmit the proposed fee shifting rule recommended by the minority report to the Court for its reconsideration. The Civil Practice Committee also was instructed to hold such hearings and to permit the participation of such interested parties as may be appropriate.

Although the ultimate result of the Court's June 11, 2002, administrative determination remains unresolved, in my view the Court's preliminary action reflects an appreciation of the value that a fee shifting rule could add to litigation designed to enforce rights guaranteed by the State Constitution. *Mount Laurel* litigation is a prominent example of the kind of litigation that would benefit from a fee shifting proposal. *Mount Laurel II* never intended that the builder's remedy would be the only means of vindicating the constitutional mandate for the construction of affordable housing. As this Court made clear in *Hills, supra,* the builder's remedy was developed not for the benefit of builders but to advance the constitutional interest in affordable housing. "We concluded that if it were possible for builders to profit from lower income housing, they would pursue it, and further concluded that such pursuit was likely to increase compliance with Mount Laurel." 103 *N.J.* at 54, 510 *A.*2d 621. Moreover, in response to the

enactment of the Fair Housing Act that we sustained in *Hills,* the Court expressed its expectation that successful builder's remedy litigation in the future rarely would occur: "If the Council conscientiously performs its duties, including determining regional need and evaluating whether the proposed adjustments and ordinances provide the requisite fair share opportunity, a successful *Mount Laurel* lawsuit should be a rarity." 103 *N.J.* at 35, 510 *A.*2d 621.

In my view, the Court's ultimate approval of a rule permitting fee shifting for the benefit of plaintiffs who successfully institute and conclude litigation asserting rights under the State Constitution, and especially rights under the *Mount Laurel* doctrine, would be a highly constructive initiative that would diminish future reliance on builder's remedy litigation and encourage the participation of nonprofit plaintiffs in litigation designed to vindicate the constitutional principles underlying *Mount Laurel II.*

## II

The *Mount Laurel* doctrine that recognized a constitutional predicate for affordable housing, and the builder's remedy established as a mechanism to vindicate that constitutional right, are principles that first were recognized by this Court. In that most basic sense, their implementation is our ultimate responsibility.

Not for any lack of will or commitment on our part, the reality is that no appeal presenting a certifiable or constitutional question concerning the builder's remedy has been presented to this Court in over a decade. Although anecdotal reports about problems in the application of the builder's remedy have been widespread, this appeal affords the Court its first opportunity in over ten years to initiate a course correction. No one can predict when the next such occasion will arise. In our only major *Mount Laurel* appeal during the nineties, the Court unanimously invalidated a COAH regulation permitting a municipality to establish a residential preference for fifty percent of that community's regional fair share of affordable housing, concluding that the regulation was inconsistent with both the Fair Housing Act and the regional focus of the

*Mount Laurel* doctrine. *Township of Warren, supra,* 132 *N.J.* at 28–36, 622 *A.*2d 1257.

Although not among the issues certified, the fundamental flaw that this record reveals concerning the manner in which trial courts are implementing the builder's remedy requires our attention. Contrary to *Mount Laurel II,* and unauthorized by the Fair Housing Act, a COAH regulation on range of affordability that excludes from affordable housing households below forty percent of median income is being relied on by trial courts in builder's remedy litigation on the mistaken assumption that application of the regulation is mandatory. Similarly, trial courts are applying COAH's fifteen percent set-aside preference in the belief that it is binding, rather than observing this Court's expectation that at least a twenty percent affordable housing set-side would be an appropriate condition of a builder's remedy. *Mount Laurel II, supra,* 92 *N.J.* at 279 n. 37, 456 *A.*2d 390.

The Court should address those critical questions in this appeal. The understandable assumption by trial courts is that our opinion in *Hills, supra,* advocating harmonization of judicial decrees and COAH regulatory determinations, 103 *N.J.* at 37, 63, 510 *A.*2d 621, requires application of COAH's regulations to builder's remedy suits. In my view, the *Hills* Court never would have contemplated or intended that the *Mount Laurel* doctrine or the builder's remedy could be undermined by a COAH regulation that excluded our poorest families from occupying affordable housing units the construction of which the *Mount Laurel II* Court anticipated would be for their primary benefit.

### III

For the reasons stated, I would remand this matter to the Law Division to revisit the builder's remedy awarded to Toll Brothers. Specifically, the court should reconsider its determination that West Windsor's affordable housing ordinance must mirror the COAH range of affordability regulation. In my view, the court on remand should be authorized to redetermine the scope of the

builder's remedy and to impose its own requirements concerning the range of affordability of low- and moderate-income housing units to be constructed by Toll Brothers. The requirements imposed by the court clearly should include low-income housing units affordable to households with incomes below forty percent of median income. Moreover, the court should redetermine the number of affordable housing units to more closely reflect the twenty percent minimum set-aside that this Court contemplated in *Mount Laurel II*.

In all other respects I join in the Court's disposition of this appeal.

*For affirmance*—Chief Justice PORITZ, and Justices COLEMAN, LONG, VERNIERO and LaVECCHIA—5.

*For affirmance and remandment*—Justices STEIN and ZAZZALI—2.